# LARRY HUGH THOMAS *v.* STATE OF MARYLAND

[No. 901, September Term, 1977.]

*Decided April 13, 1978.*

The cause was argued before MORTON, MELVIN and WILNER, JJ.

*Andrew Jay Graham, Assigned Public Defender,* with whom were *Kramon & Graham* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Wehland, State's Attorney for Howard County, Ronald Spahn*

and *Stephen J. Smith, Assistant State's Attorneys for Howard County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Larry Hugh Thomas was convicted of rape and battery. He was sentenced to life imprisonment for the rape and a consecutive term of 10 years for the battery. On appeal, he complains that:

> (1) Evidence (a house key) obtained as the result of his arrest on an unrelated charge should have been suppressed;
> (2) An incriminating letter that he wrote, while incarcerated at the Howard County Detention Center, to another inmate at that Center was unlawfully seized and should have been suppressed; and
> (3) The court erred in convicting him of both rape and battery, and in imposing consecutive sentences for those convictions.

### (1) *Suppression of the Key*

Shortly after 6:00 p.m. on April 25, 1976, two women had their pocketbooks stolen from an establishment in Columbia known as the Slayton House. From a description given by one of the women and a witness who had seen a man carrying a pocketbook out of the Slayton House, a broadcast was put out on a police radio, advising the police to be on the lookout for a larceny suspect described as a Negro male, eighteen years old, approximately 5'8" tall, having a moustache, wearing red pants and a red and white striped shirt, and appearing to be intoxicated.

Shortly after hearing that broadcast, Officer Charles Gable observed a person matching that description enter a grocery store. When the person, who turned out to be appellant, left the store, Gable accosted him and "asked him to come with me up to the Slayton House, which he agreed to do." Gable escorted appellant to the Slayton House in the patrol car, reading him the *Miranda* warnings on the way. When they

arrived, one of the witnesses identified appellant, whereupon he was formally arrested, charged with petty larceny, and taken to police headquarters.

There, he was searched, and among other items taken from him was a silver-colored key. For purposes of identification, Officers Dennis L. Pruitt and Charles M. Gable scratched their initials onto the key — "DLP" and "CMG". Appellant was then transported to the County Detention Center, from which he was released the next day. A key was returned to appellant upon his release.[1]

Around 11:00 on the following evening (April 26), Ms. S, the rape victim, left her home in Columbia to get a bite to eat. Finding the restaurant closed, she was returning to her car on the parking lot when two men approached her. After a short innocuous conversation, one grabbed her pocketbook and threw it to the other, who took off with it and apparently has not been heard from since. The other man grabbed her hand and, placing his other hand in his pocket so as to make it appear to Ms. S that he had a gun, led her to a wooded area near the Interfaith Center. There, keeping her in fear of her life, he raped her once and tried, without success, to rape her again and to perform various unnatural sex acts upon her. He also struck her several times in the face. Following this, he led her to another area about fifty feet away where he threw her to the ground, choked her, and beat her severely across the face with a stick and a vacuum cleaner wand. As a result, her face was a bloody mess, and her nose was broken.

When the attack was over, the assailant departed, Ms. S stumbled to a nearby apartment house, and the police were called. Officer John Martin arrived and made a search of the areas where the attack occurred. In addition to recovering some of Ms. S's clothing that had been left behind, he found

---

1. The State had some difficulty establishing a precise chain of custody with respect to this key. The police officers testified that they delivered the initialed key to the correctional officer at the Detention Center. The correctional officer claimed he received no key from the police officers, but that he did recover a key from appellant when he searched him. It is clear that a key came into the possession of the correctional officer, and that that key was returned to appellant upon his release.

a stick and a key — a silver-colored key that had scratched on it the initials "DLP" and "CMG". Corporal Mark Paterni, one of the officers assigned to investigate the rape, noticed the key back at the police station, as well as the markings on it, learned in some manner (not disclosed in the record) of Officer Pruitt's connection with the key, spoke to Pruitt and presumably learned from him of appellant's connection with the key, and, based upon that information, obtained an arrest warrant for appellant. Paterni and several other officers, including Detective R. W. Roby, made the arrest at appellant's home. Roby took the key with him, and found that it unlocked the front door of appellant's home. At trial, the key was admitted into evidence.

Appellant claims that the key should have been suppressed because it was the product of his arrest on April 25, which, he says, was unlawful. He argues that the earlier arrest was unlawful because (i) it was effected without benefit of a warrant, and (ii) the crime, a misdemeanor, was not committed within the presence of the arresting officer. Thus, he argues, the key was initially seized from him and marked improperly, that it therefore represents "fruit of the poisonous tree", and is constitutionally excludable as evidence under the doctrine announced in *Wong Sun v. United States,* 371 U. S. 471 (1963).

The simplest answer to this contention is that there was nothing unlawful about appellant's earlier arrest. It was fully authorized by Md. Annot. Code art. 27, § 594B. Subsection (d) thereof allows a police officer to arrest a person without a warrant if he has probable cause to believe:

> (1) That an offense listed in subsection (e) of this section has been committed, and
> (2) That the person has committed such offense, and
> (3) That unless the person is immediately arrested,
>> (i) He may not be apprehended, or
>> (ii) He may cause injury to the person or damage to the property of one or more other persons, or
>> (iii) He may tamper with, dispose of, or destroy evidence."

One of the offenses listed in subsection (e) is a violation of art. 27, § 341 — stealing goods worth less than $100.

Appellant has not claimed that Officer Gable was without probable cause to effect the arrest; and indeed, at oral argument it was conceded that such probable cause did exist. The police radio broadcast, coupled with his own observations, afforded Officer Gable with probable cause to believe that (1) the offense of petty larceny had been committed, (2) the person he saw enter the grocery store, namely, appellant, committed the offense, and (3) unless immediately apprehended, the suspect might, at the very least, dispose of evidence (the fruits of the larceny) or possibly escape altogether. *See Bosley v. State,* 14 Md. App. 83 (1972).

The arrest being lawful, the *Wong Sun* "doctrine" is inapplicable, and the key was therefore admissible.

Even if, *arguendo,* the prior arrest had been unlawful, *Wong Sun* would not apply for other reasons. The key was returned to appellant when he was released from jail. It was not used against him in a prosecution of the crime for which he was arguably arrested unlawfully; nor did it lead to any other evidence as to that crime or any other crime that appellant had then committed. The key was found, independent of the prior arrest, at the scene of another crime committed after the taint of any illegality had been washed away. Its discovery there was not the product of the earlier arrest. In short, if the tree (the earlier arrest) was poisonous, it died without bearing fruit.

## (2) *Suppression of the Letter*

After his arrest for the rape and battery, appellant found himself back in the Howard County Detention Center. There, on or about August 17, 1976, while awaiting trial, he handed a sealed envelope to Correctional Officer Daniel Heyn. The envelope was addressed to a Herb Robinson, another inmate at the Detention Center. Heyn gave the envelope to his supervisor, Mr. Gamber, who opened the envelope and found that it contained a letter that included statements incriminating to appellant. Gamber gave the letter to Mr.

Hobbs, his supervisor. Hobbs gave the letter to the director of the Detention Center, Mr. McClellan, who, in turn, directed that it be turned over to the State's Attorney. The letter was, in fact, given to the State's Attorney.

Appellant moved to suppress the letter as evidence on the ground that it was a "privileged communication" that was "illegally seized by a prison official against the wishes of the Defendant, and without any form of waiver on the part of the Defendant". He asserted in his pre-trial motion that, although such officials may have the authority to open prisoner mail in order to insure the security of the facility, they have no authority to open such mail "where the sole purpose is to read the contents thereof."

At a hearing held on the suppression motion, Mr. McClellan described the regulations pertaining to prisoner mail. These regulations, he said, were set forth in a letter that was posted on the walls or bulletin boards of the Center. The letter says nothing specifically about intra-facility mail from one inmate to another, but does provide that (1) all "outgoing inmate mail" may be sealed, (2) all "incoming mail will be opened for inspection before delivery to the inmate", (3) "incoming mail will be inspected for contraband and subject to additional review to determine appropriateness", and (4) such mail will be returned to the sender if it is inflammatory, advocates escape, violence, disorder, or assault, directly or indirectly threatens the security, safety, or order of the institution or its personnel, or contains coded or otherwise undecipherable language. Mr. McClellan amplified this by stating that his correctional officers "should inspect all packages or parcels being handed from one inmate to another, which would include letters or contraband or anything of a serious nature that might be detrimental to the security of the institution." Specifically with respect to letters, he said that "what is inside of the letter could possibly be contraband and the only way we could determine that is to look and see."

Following this, appellant testified that he had given a letter, written by him, to a correctional officer, and that he had not given anyone permission to read that letter. Upon this

evidence, the motion to suppress was denied; and, as a result, the letter was produced and admitted into evidence at trial.[2]

In reviewing the pre-trial decision on the suppression motion, we must consider the inter-play between the First Amendment right of free speech and the Fourth Amendment guarantee against unreasonable searches and seizures.

We start with *Stroud v. United States,* 251 U. S. 15 (1919), one of the plethora of cases involving the now late but still famous "birdman of Alcatraz." Stroud, while an inmate at the Federal prison at Leavenworth, had allegedly killed a guard, and was charged with first degree murder.[3] Certain letters, containing inculpatory statements, were admitted into evidence against him. They had been written by him after the homicide and while he was an inmate at Leavenworth. As the

---

2. When the State first offered the letter into evidence, defense counsel objected on the ground that the State had failed to show a complete chain of custody of the letter. After the testimony of two additional witnesses designed to forge the last two links in the chain, the State again offered the letter. At this point, without expressing a clear objection, counsel suggested that the State had failed to establish that appellant had written the letter. No objection was made on Constitutional grounds, and the letter was admitted into evidence. At the conclusion of the State's case, defense counsel recalled Correctional Officer Heyn as a defense witness and questioned him again about the letter. On cross-examination by the State's Attorney, Heyn repeated his earlier testimony that appellant had given him the sealed envelope. He was then asked whether appellant had said anything when he gave Heyn the envelope, to which the witness replied: "He said something to the effect that I could open it, go ahead and give it to Herb, there's nothing in it. Not in those exact words, but to that effect." This statement was not rebutted.

Former Maryland Rule 729 was applicable to those proceedings. Subsection g. thereof provided that, if a suppression motion is granted, the property was to be returned to the person entitled to it and "shall not be offered in evidence by the State at the trial on the merits in the criminal proceeding." If the motion was denied, that ruling "shall be binding at the trial" unless the trial judge grants a *de novo* hearing on a renewal of the suppression motion. The rule further provided that a pre-trial ruling denying a motion to suppress "shall in any event be reviewable on appeal. . . ." *See also* subsection f. We therefore will review and consider the action of the court in denying the pre-trial motion to suppress, notwithstanding the failure of appellant to preserve the same objections at trial, Silbert v. State, 10 Md. App. 56 (1970); Taylor v. State, 17 Md. App. 536 (1973), and without regard to Heyn's intimation at trial that appellant may have consented to the search. In that regard, there is nothing in Heyn's statement that would indicate appellant's consent to the *seizure* of the letter.

3. He was tried and convicted twice before of the crime, but on both occasions the convictions were reversed when the Governor confessed error. This was an appeal from his conviction following the third trial. This time his luck ran out, as the Supreme Court affirmed the judgment.

Court noted, "[t]hey were voluntarily written, and under the practice and discipline of the prison were turned over ultimately to the warden, who furnished them to the district attorney." Stroud had applied for the return of the letters under the doctrine laid down in *Weeks v. United States,* 232 U. S. 383 (1914), which application was apparently denied.[4]

The Court affirmed that denial, holding *Weeks* to be inapplicable. It said, 251 U. S. at 21:

"In this instance the letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process. They came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution. Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure in violation of his constitutional rights." [5]

*Stroud* is virtually indistinguishable from the case at bar. The question is whether it is still "good law", whether it survives as a controlling Constitutional precedent. In 1967, the Supreme Court of Florida still considered it viable. In *Baker v. State,* 202 So. 2d 563 (Fla., 1967), the defendant claimed that the interception and copying, by a jail official, of a letter written by defendant to his uncle constituted an invasion of privacy and an illegal seizure. Concluding, however, that the jailer, to whom the letter was given for mailing, "read it as a standard security measure practiced to insure the internal stability of the jail" and that the letter therefore "came into possession of the state in the orderly process of the operation of the jail", the court held that the

---

4. This was tantamount to a modern motion to suppress. In *Weeks,* the Supreme Court held that papers seized from a person in violation of his Fourth Amendment rights had to be returned to him and could not be used in evidence against him.

5. It is apparent from this passage that the Court found no violation of Fifth Amendment rights either. The Opinion does not disclose how the prison officials initially came into possession of the letters or to whom the letters were addressed.

letter was properly admitted into evidence. Succinctly, the court stated, at page 567:

> "The use of admissions against interest in letters written by prison inmates has been held proper by the United States Supreme Court. Stroud v. United States, 251 U.S. 15, 40 S. Ct. 50, 64 L. Ed. 103 (1919). *Stroud* is still the law. . . . We know of no rule of law or constitutional provision which prohibits the use in evidence of a letter obtained in this way." [6]

The holding in *Stroud* was based, in part, on the general authority of prison officials to engage in reasonable censorship of communications from, to, and among inmates as a necessary adjunct to maintaining discipline within the institution. First Amendment rights were not considered by the Court. *Stroud's* continued vitality must therefore be re-examined in light of the more recent pronouncements of the Supreme Court in *Procunier v. Martinez,* 416 U. S. 396 (1974), *Wolff v. McDonnell,* 418 U. S. 539 (1974), and the progeny fostered by them.[7]

*Procunier v. Martinez* involved a broad class action attack on the mail censorship regulations operative within the California Department of Corrections. It was decided solely upon First Amendment grounds, and did not at all involve search and seizure questions under the Fourth Amendment.[8] It was, as the majority Opinion noted, a question "not

---

**6.** *See also* Hayes v. United States, 367 F. 2d 216 (10th Cir., 1966); Denson v. United States, 424 F. 2d 329 (10th Cir., 1970), *cert. denied* 400 U. S. 844 (1970); United States v. Wilson, 447 F. 2d 1 (9th Cir., 1971), *cert. denied* 404 U. S. 1053 (1972); Cox v. Crouse, 376 F. 2d 824 (10th Cir., 1967), *cert. denied* 389 U. S. 865 (1967); United States v. Palmateer, 469 F. 2d 273 (9th Cir., 1972); Ellis v. State, 86 So. 2d 330 (Miss., 1956); State v. Johnson, 456 S.W.2d 1 (Mo., 1970), adhered to on later appeal, 476 S.W.2d 516 (1972), *cert. denied* 409 U. S. 859 (1972); People v. Dinkins, 242 C.A.2d 892 (Cal., 1966); People v. Jones, 19 C.A.3d 437 (Cal., 1971).

**7.** *See, for example,* United States v. Savage, 482 F. 2d 1371 (9th Cir., 1973), *cert. denied* 415 U.S. 932 (1974), decided after the Supreme Court noted probable jurisdiction in, but before it decided, Procunier v. Martinez.

**8.** It is clear, moreover, that the relevant consideration was not the free speech rights of the inmates, but of those on the outside who correspond with the inmates. *See* Concurring Opinion of Justices Marshall and Brennan, 416 U. S. at 422; Procunier v. Navarette, 434 U. S. 555, 98 S. Ct. 855 (1978).

previously addressed" by the Court.[9] The principle announced by the Court was this:

> "[W]e hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." [10]

*Wolff v. McDonnell* dealt specifically with the extent to which prison officials could open, or otherwise inspect or place restrictions on, incoming mail from attorneys, and thus involved a mixture of First and Sixth Amendment rights. With respect to First Amendment considerations, the Court noted (418 U. S. at 576) that "freedom from censorship is not equivalent to freedom from inspection or perusal." As to the Sixth Amendment (right to the assistance of counsel) question, the Court observed, at page 577, that "the possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters."

The Court gave clear recognition in both of these cases to the existence of a proper and identifiable governmental

---

9. 416 U. S. at 406.

10. Later in the Opinion, the Court seemed to add a third criterion — that of "minimum procedural safeguards". As to this, it affirmed the District Court requirement (without appearing to mandate it as its own) that an inmate be notified of the rejection of a letter written by or to him, that he have a reasonable opportunity to protest the decision, and that complaints be referred to a prison official other than the one who originally disapproved the correspondence. *See, also,* Hopkins v. Collins, 548 F. 2d 503 (4th Cir., 1977), in which the Court appeared to view these three elements as necessary to satisfy due process requirements.

interest in the monitoring of communications to and from prisoners. It, in fact, stated in *Procunier,* at page 412:

"One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners."

These "identifiable governmental interests" are equally apparent and applicable with respect to the Howard County Detention Center as any other penal institution. That part (or all) of its inmate population consists of pre-trial detainees, as compared with convicted criminals, does not lessen the duty of the center's officials to preserve internal order and discipline, maintain security, and attempt, as best they can, to rehabilitate a very difficult group of people. As stated by the Court in *Smith v. Shimp,* 562 F. 2d 423, 426 (7th Cir., 1977), a case involving pre-trial detainees:

"If unmonitored use of the mail presents a substantial threat to jail security, the burden imposed on the detainees' freedom to communicate private matters is justified. The asserted purpose of reading the detainees' letters is unrelated to any design to pry into their private affairs or to discourage communication of private matters. The reluctance of the detainees and of their correspondents to share personal matters with jail officials does not merit any sacrifice in the security of the institution. If conflict between the state's interest in jail security and the civil liberties of the detainees cannot be avoided or limited by reasonable means, the latter must yield." [11]

---

11. *See also* Duran v. Elrod, 542 F. 2d 998 (7th Cir., 1976); but *compare* Taylor v. Sterrett, 532 F. 2d 462 (5th Cir., 1976), footnote 11. It has been public knowledge for a long time, and is documented in the record in this case, that

Once the identifiable governmental interest is established, the issue becomes the scope of the authorized monitoring. In *Procunier* and *Wolff,* the Court focused on communication with the outside world, particularly correspondence with such "privileged" persons as attorneys, the courts, and family members. Distinctions, in fact, were suggested there, and made clear in subsequent cases in the Federal District and Circuit courts, between the types of restrictions that may be placed on "privileged" and "nonprivileged" correspondence.[12] There is nothing in any of the cases to suggest that the same balance struck with respect to outside correspondence, whether "privileged" or "unprivileged", must, of necessity be applied equally to communications between inmates. Indeed, the courts have sustained far more substantial restrictions on inter-inmate correspondence. See, for example, *Peterson v. Davis,* 415 F. Supp. 198 (E.D. Va., 1976), and *Williams v. Ward,* 404 F. Supp. 170 (S.D.N.Y., 1975), upholding institutional regulations prohibiting such communication altogether without approval by the superintendent of the institution.

The rationale for permitting more extensive interference with the free flow of communication between inmates, particularly material enclosed in sealed envelopes, is self-evident. The potential for mischief — escape, riot, passage of contraband, disturbance, defiance of authority, injury to correctional staff or other inmates — is infinitely greater from unfettered correspondence among inmates than it is from correspondence with persons outside the institution. Accordingly, there is a more significant identifiable

---

the Howard County Detention Center is old (indeed antiquated) and severely overcrowded. It houses a mixed bag of pre-trial detainees, many of whom have been charged with serious and violent crimes, many of whom have been incarcerated on one or more prior occasions. In some respects, the difficulty in maintaining order, discipline, and security in such a setting far exceeds that in facilities for convicted persons, particularly those newer ones housing only "minimum security" prisoners. If, as appears to be the case, institutional security is a paramount consideration, whether the inmates are pre-trial or post-conviction detainees is not, of itself, an overriding or controlling circumstance.

12. *See, for example,* Smith v. Shimp, *supra,* 562 F. 2d 423 (7th Cir., 1977), Williams v. Ward, 404 F. Supp. 170 (S.D.N.Y., 1975). Appellant claims that the letter in question here was "privileged" because it was sealed and private. That is not, however, the basis for determining whether it is "privileged".

governmental interest in regulating that exchange than there is in controlling external correspondence (particularly that *from* the inmate), thereby necessitating a greater permissible invasion of an inmate's "right" of privacy.

It is not necessary for us to consider whether the policies and procedures applicable to inmate correspondence at the Howard County Detention Center, as testified to by Mr. McClellan and posted on the walls at the center, were facially conformable in every respect to the dictates of *Procunier* or *Wolff.* That it is not the issue. It is clear, under those cases, that the correctional staff was authorized to open and inspect "incoming" mail. It was also permissible for the staff to read such mail, if for no other purpose than to make sure that it did not contain information relating to escape, riot, or other breaches of discipline and security. Moreover, the record shows that the fact that "incoming" mail would be opened and inspected was published and made known to the inmates.

We thus have a situation in which the letter handed to Officer Heyn, though "outgoing" mail as to appellant, would be "incoming" mail as to the addressee Robinson. By virtue of the published regulations, appellant therefore knew, or should have known or at least suspected, that the letter was subject to being opened and read by the correctional staff. As that potential invasion was not only to be expected at the center but was permissible under *Procunier,* appellant had no right to assume that his chosen means of communication would ensure privacy.[13] We therefore conclude that, under these circumstances, the rationale and holding in *Stroud* remains intact, and that the search, seizure, and admission of the letter did not violate appellant's First or Fourth Amendment rights.

### (3) *Conviction of Rape and Battery*

The testimony of Ms. S was sufficient to establish that appellant choked and beat her after the rape was completed,

---

**13.** Thus, the situation was no different than if he had put a stamp on the envelope and mailed the letter to Robinson. It would have been opened and read before being delivered.

that the incidents were distinct from each other, and, in fact, occurred in different places. The separate verdicts and sentences were therefore proper. *Cates v. State,* 21 Md. App. 363 (1974), *cert. denied* 272 Md. 739 (1974).

*Judgments affirmed; appellant to pay the costs.*