968 A.2d 162

**Ronald SPARKMAN**

v.

**STATE of Maryland.**

No. 1196, Sept. Term, 2007.

Court of Special Appeals of Maryland.

March 26, 2009.

Celia A. Davis (Nancy S. Forster, Public Defender on the brief), Baltimore, for Appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), and RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

Ronald Sparkman, appellant, was charged with the murder of Ralph "Wes" Pritchett, who was shot to death in Baltimore City on January 14, 2005. Following a trial in May 2007, a jury sitting in the Circuit Court for Baltimore City convicted

Sparkman of first-degree murder, as well as use of a handgun in a crime of violence, and wearing or carrying a handgun.[1]

On appeal, Sparkman poses the following two questions:

1. Did the court below err by admitting into evidence a letter purportedly written by Appellant?

2. Was the evidence legally insufficient to sustain Appellant's convictions?

For the reasons set forth below, we shall affirm.

## FACTUAL SUMMARY

### A. The Suppression Hearing

Prior to trial, Sparkman moved to suppress a letter purportedly written by him while he was in pretrial custody. The letter was sent from jail, but it was seized when it was returned to the institution with a label marked "RETURN TO SENDER," "INSUFFICIENT ADDRESS," and "UNABLE TO FORWARD."

Corporal Monique Mitchell, a correctional officer in the Intelligence Unit of the Division of Pretrial Detention, Maryland Department of Public Safety and Correctional Services, was the sole witness at the suppression hearing. As of the hearing, she had worked for Pretrial Services for eleven years, the last five of which were in the Intelligence Unit. She stated that her unit's mission is to acquire information about inmates' involvement in "criminal activity."

On June 25, 2006, some eighteen months after Pritchett's murder, Mitchell received an envelope from the mailroom at the Baltimore City Detention Center, addressed to Tamira Sparkman. The envelope, which measured 3½ by 6½ inches, contained a yellow label, apparently applied by the U.S. Postal Service, stating "RETURN TO SENDER," "INSUFFI-

---

1. The court sentenced appellant to life in prison for the murder, and to a consecutive 20–year term for use of a handgun (the first five years to be served without parole). The court merged the other handgun offense for sentencing purposes.

CIENT ADDRESS," and "UNABLE TO FORWARD." The return address on the letter included appellant's name, his inmate number, and the address of the detention center.

Mitchell opened the envelope. It contained two sheets of lined, letter-sized paper, which were folded repeatedly. It also contained a separate sheet of paper, which was also folded, with a photograph inside of it. The separate sheet appeared to be a copy of an autopsy photograph, which Mitchell found "suspicious" and "not ordinary mail." She then opened the lined sheets and saw a handwritten letter. At the bottom of the second page she saw the following sentence: "1 picture is of my victim & the other 1 is my mother!" The letter also contained the statement: "I went to prison at a young age & back I am." Because Mitchell thought that the envelope's contents indicated "some kind of criminal activity," she did not return it to appellant (which she normally would have done, having found no contraband). Instead, it went to the detective assigned to this case.

When asked why she opened the mail, Mitchell said: "Because it was return to sender" and "the thickness of the envelope ... it could be something inside the envelope." Mitchell explained that the institution's policy provided for the opening and perusal of all "suspicious" mail, and the thickness of the envelope prompted her suspicion that it might contain contraband. Mitchell added that she had to unfold the papers because they could have contained drugs. In addition, Mitchell stated that incoming mail is inspected for contraband and, as a matter of policy, "all return to sender mail" is opened, as it is regarded as "incoming mail." According to Mitchell, inmates sometimes attempt to circumvent the policy barring inmate-to-inmate correspondence by sending a letter to a bogus address and writing the other inmate's name as the return addressee.

As to the policy of opening mail that is marked "return to sender," Mitchell elaborated:

> That's the policy because we open it to make sure nothing is coming back inside the institution, they may try to send it

out or something—sometimes inmates send out mail or send mail to each other, that is not permitted, not permitted mail to each other, mail or correspondence to one another. So in that case, we do check return to sender mail just to make sure they are not trying to get it to another party inside the institution.

The State introduced as an exhibit a document governing Mailroom Operations, dated April 15, 2003.[2] It included the statement, in section VI.C, that "DPDS inmates shall be prohibited from mailing correspondence to each other."

On cross-examination, Mitchell acknowledged that State's Motion Exhibit 3, a page from the inmates' handbook, said nothing about the institution's policy of opening returned mail.[3] But, she pointed out that it stated that incoming mail is opened prior to delivery and inspected for contraband or money orders. The following exchange is pertinent:

[DEFENSE COUNSEL]: For incoming inmate mail, and tell me if I'm right, this ICU, that is your group, right?

[MITCHELL]: Yes.

[DEFENSE COUNSEL]: May search an inmate's incoming mail when there is a reasonable suspicion that inmate is engaged in criminal activity or any action which may jeopardize public safety, correct?

[MITCHELL]: Yes.

[DEFENSE COUNSEL]: And then it says ICU will document that reasonable suspicion of inmate engaging in activity, including document knowledge that form[s] the basis for reasonable suspicion. Now, are you telling us that upon receiving this matter, return [to] sender that you had reasonable suspicion to believe that Mr. Sparkman was engaged in illegal activity?

---

**2.** We are unable to locate the motion exhibits in the record. The exhibits seem to correspond to trial exhibits, but the trial exhibit numbers do not match the motion exhibit numbers.

**3.** No other written policy specifically addressed returned mail, or noted that it was treated as incoming mail.

[MITCHELL]: Well, sir, when it is return to sender, again we do open it because we do believe, that sometime[s] it's inmate to inmate correspon[d]ence and something being done to bring the mail back in, we have to make sure there is no type of contraband, and we search it entering the institution.

[DEFENSE COUNSEL]: Okay. How, first of all, if it is sent out and return[ed] to sender, how is that being sent, how would that be mail sent to another inmate?

[MITCHELL]: Because that's what they do . . . . They put them as the person to send out in order to receive it. I'm trying to say this correctly? When he writes the letter, so that the other party receives it what they do is give a bogus address that's somewhere that they know they are going to send it back to the person that's going to receive it; does that make sense?

The following exchange is also relevant:

[DEFENSE COUNSEL]: Well, my question to you is, what contraband was inside that envelope that allowed you to turn it over to the State's Attorney's Office?

[MITCHELL]: Well, the letter—picture itself, it's a morgue, a picture of someone having an autopsy. I thought, that is suspicious. That's not everyday mail.

[DEFENSE COUNSEL]: But a photo copy is not a contraband, is it?

[MITCHELL]: No, it's not contraband.

According to Mitchell, the letter "seem[ed] to be criminal activity that involved some type of criminal activity. I found it to be." The following ensued:

[DEFENSE COUNSEL]: You thought that a photo copy was criminal activity?

[MITCHELL]: Once I perused it.

[DEFENSE COUNSEL]: So you did read the letter.

[MITCHELL]: I perused the letter. Once I saw the picture, I perused it at the bottom and saw a statement that was made.

Following argument by counsel, the court issued an oral ruling denying the motion. It stated, in part:

The Court believes and holds that it was proper for the corporal to inspect the letter. There is no question that the Court of Appeals has held that there is no absolute right of expectation, but rather diminished right of expectation [of privacy] pursuant to Fourth Amendment. And that the rule indicated that the institution has to be reasonable. This was a returned letter, therefore, mak[ing] it incoming mail. The rules in the institution are that any incoming mail that is believed that there is a reasonable suspicion that may involve public safety, there inside the institution or inside or out of the institution, may be inspected. And certainly as the Court of Appeals has said in the Thompson [sic][4] case, smuggling money, drugs and weapons, other contraband, all too common in the institution; therefore, inspection of the letters that are in this case, two [sic] fat to just be a single letter, warranted her opening the envelope. Once she opens the envelope and saw a picture, an autopsy picture, this Court holds that she then had the authority then, based on that suspicion, now she has that suspicion, in an effect of exacerbated it by the presence of the autopsy picture, she had a right to read the letter, and when she discovers that the letter indicated that, in fact, the Defendant was admitting that this was the victim of his crime, then [she] had the responsibility to turn that over to the State's Attorney's Office. So I will deny the motion for those reasons, and allow the State to introduce the letter. . . .

### B. The Trial

The prosecution presented five witnesses at trial, including two eyewitnesses to the shooting who identified appellant's photo in an array and identified appellant at trial. The defense did not present any witnesses.

---

4. This was an apparent reference to *Thomas v. State*, 285 Md. 458, 404 A.2d 257 (1979), a similar case cited by the parties that we discuss below.

Frank Gilliam testified that at about 10:00 p.m. on January 14, 2005, while he was talking with a friend near an apartment complex he called "Target City," a "guy came up and shot several times, shot at this guy named Wes about seven times." At the time, Wes was on the sidewalk, near Madison Street. Gilliam was about twenty to twenty-two feet away from the victim, but could not estimate how far he was from the shooter. The shooter came from "like Bond Street, across Madison." Gilliam said: "I saw, saw who it was, I ran." He described the assailant as a "black male, approximately six foot, dark skinned, short hair cut, black hoodie." Gilliam later identified appellant in court as the shooter.

Gilliam was arrested in the early morning of January 15, 2005, and charged with heroin possession. He told a patrol officer about the shooting. On February 4, 2005, he spoke with Detective Arthur Brummer, who showed him a photo array. He picked out the photo of appellant, whom he called "Little Ronald," as the person who shot Wes. He stated that he knew appellant from living in the same neighborhood and seeing him "mostly every day."

Ernest Minor testified that on January 14, 2005, he was with his friend, Ralph "Wes" Pritchett, in the area of Monument Street and Broadway in Baltimore. As the pair walked through a "cut" between apartment buildings, a man in dark clothing and a dark hat walked toward them and began shooting. Minor saw an "object" in the man's hand, and then "the fire" of muzzle flashes. After the first flash, Minor ran around the block. When he returned, he saw his "buddy lying on the ground dead." He did not "know" the shooter, but he "knew of" him, having seen him once or twice previously.

Minor did not report what he had seen until April 2005, when he was arrested on unrelated charges and asked to speak to the police. He told Detective Brummer what had happened. Brummer showed Minor a photo array, from which Minor picked appellant's photo as the assailant. He

also identified appellant in court.[5]

Brummer testified that at 10:19 p.m. on January 14, 2005, he responded to an emergency call for a shooting. Five .38 caliber shell casings and two bullet fragments were recovered from the scene. He spoke with Gilliam on January 15, 2005, and again on February 4, 2005, when he showed him the photo array. He spoke with Minor on April 12, 2005. He identified State's Exhibit 4 as a photograph of the "split between Madison and Monument Streets," where the shooting occurred.

Dr. Carol Allen, of the Medical Examiner's Office, performed the autopsy on the victim. She was accepted as an expert in the field of medical and forensic pathology. Dr. Allen explained that the victim suffered five separate gunshot wounds, including three to the back and two to the forearm. One of the bullets penetrated the large intestine, heart, and right lung, fatally injuring the victim. Three "large caliber projectiles" were recovered from the body. Two of the gunshot wounds were "through and through," i.e., they entered and exited the victim's body. Those bullets were not recovered. The parties stipulated that a firearms and ballistics expert would have testified that bullets recovered from the victim were all fired from the same .38 caliber weapon.

Corporal Mitchell was the State's final witness. Her trial testimony was generally consistent with the testimony she provided at the suppression hearing. She stated that on June 25, 2006, she received an envelope from the mailroom at the detention facility, which had a yellow sticker on it that said, "RETURN TO SENDER." The envelope was addressed to "Tamira Sparkman, 615 N. Ellwood Street, Baltimore, Maryland 21202." The sender's name appeared as "Ronald Sparkman," with a return address of 401 E. Eager St. in Baltimore

---

**5.** Minor's charges in Baltimore City were resolved and he was placed on probation. But, he was charged in federal court with narcotics possession, and entered into a plea agreement; in exchange for his release from custody, Minor had to "testify truthfully" in the case against appellant.

City, the location of the Baltimore City Detention Center. Corporal Mitchell recounted that she opened the envelope "just to make sure it didn't have a contraband money order, or cash, sometimes mail comes inside the mail." She saw two handwritten pages and two photographs, one of which appeared to be an autopsy photo. She noted: "[W]e don't get pictures of that sort in the mail...." Upon seeing the autopsy photo, Mitchell "perused the letter." It said: "One picture of my victim and the other one is my mother and father." The letter was admitted into evidence over objection.

After the prosecution rested its case, defense counsel made a motion for judgment of acquittal, stating: "I would make a motion for judgment on all four counts." The court denied the motion. The defense rested and then renewed its motion for acquittal.

## DISCUSSION

### I.

Appellant argues that the court erred by admitting the letter purportedly written by him. He asserts that, despite his status as a pretrial detainee, the Fourth Amendment to the United States Constitution afforded him "a reasonable expectation of privacy in the contents of the envelope bearing his name." In appellant's view, the "actions of the correctional officer in opening the envelope, inspecting its contents, and reading the letter, violated [his] right to be free from unreasonable searches and seizures of his personal papers."

According to appellant, "Opening the envelope, which was returned in the same condition it was mailed, was unreasonable under the circumstances of this case." He maintains that "the envelope was not fat enough to support reasonable suspicion that it contained contraband," and the copy of the autopsy photograph did not constitute evidence "that Appellant was engaged in any criminal activity while in the detention facility." Moreover, he posits that, even if Mitchell was entitled "to open and inspect the contents of the envelope," once the inspection revealed no contraband and no indication of any

criminal activity, Corporal Mitchell should not have read the letter. Instead, she should have returned it to appellant. In addition, appellant contends that he "was not notified that mail marked 'return to sender' would be opened."

The State disagrees, asserting:

The short answer to Sparkman's complaint regarding the opening and reading of the letter returned to him, which was treated by the correctional authorities as incoming mail, is that whatever expectation of privacy Sparkman had with respect to the letter that expectation was trumped by the "legitimate security needs" of the correctional facility where he was housed awaiting trial.

According to the State, "there was ample evidence ... that institutional policy on incoming mail, even mail stamped 'Returned [sic] to Sender,' mandated that it be opened for security purposes." In its view, once Mitchell opened the letter and saw the autopsy photograph, it was not unreasonable for her "to skim the letter," because she "reasonably suspected that it contained evidence of on-going criminal activity."

As noted, the circuit court determined that Mitchell properly opened the envelope and inspected its contents for possible contraband because it was tantamount to incoming mail and because it was "too fat to be just a single letter." It reasoned that when Mitchell saw the autopsy photograph, she reasonably became suspicious and reviewed the letter. At that time, she saw appellant's inculpatory statement and properly turned the envelope and its contents over to the State. We agree with the circuit court.[6]

---

6. In *Rush v. State*, 403 Md. 68, 939 A.2d 689 (2008), the Court reiterated the applicable standard of review:

In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the evidence contained in the record of the suppression hearing. The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. We "undertake our own

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

■ Under the Fourth Amendment, pretrial detainees may retain some expectation of privacy, although, if they do, it is "diminished" when compared with persons who are not incarcerated. *See Bell v. Wolfish*, 441 U.S. 520, 557, 558–59, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Thomas v. State*, 285 Md. 458, 463, 404 A.2d 257 (1979). *Thomas* is instructive.

In *Thomas*, the defendant, a pretrial detainee, had written a letter to a fellow inmate, sealed it, and handed it to a correctional officer for delivery within the institution. 285 Md. at 459, 404 A.2d 257. A detention center official opened and read the letter. *Id.* Because it contained an inculpatory statement, it was turned over to the prosecutor. *Id.* The appellant moved to suppress the letter. *Id.*

The warden testified at the suppression hearing that the regulation governing mail at the detention center "did not cover correspondence from one inmate to another, and that the inmates were not apprised that a letter in a sealed envelope from one to another would be read by institution officials." *Id.* at 460, 404 A.2d 257. But, the regulation provided for the opening of all incoming mail, and also imposed certain restrictions on "outgoing" correspondence. *Id.* The circuit court denied the motion to suppress, and the defendant was subsequently convicted of rape and battery.

---

independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case."
*Id.* at 82–83, 939 A.2d 689 (internal citations omitted). *See also Bost v. State*, 406 Md. 341, 363–64, 958 A.2d 356 (2008).

*Id.* at 459, 404 A.2d 257. On appeal to this Court, we were of the view that mail from one inmate to another constituted "incoming mail" with respect to the inmate who was the addressee. *Id.* at 461, 404 A.2d 257. On that basis, the Court concluded that the defendant had no reasonable expectation of privacy, and affirmed the convictions. *See Thomas v. State,* 39 Md.App. 217, 229, 384 A.2d 772 (1978).

The Court of Appeals granted certiorari to consider whether reading the letter and introducing it into evidence violated the appellant's Fourth Amendment rights. *Thomas,* 285 Md. at 459, 404 A.2d 257. The Court found no violation of the Fourth Amendment. *Id.*

Notably, the Court of Appeals did not regard inmate-to-inmate mail as tantamount to incoming mail. It said, *id.* at 461–62, 404 A.2d 257:

Preliminarily, we ... disagree with the Court of Special Appeals, regarding the scope of the detention center's regulation. By use of the terms "mail," "incoming" and "outgoing," it would seem that the regulation was designed to deal with correspondence sent from inmates, via the United States Postal Service, to persons outside of the institution, and correspondence sent from persons outside of the institution, via the Postal Service, to inmates. This is confirmed by references in the regulation to the addresses of the parties, and the provision for the return to the sender of inappropriate "incoming mail." It is further confirmed by the distinction drawn between the two types of mail, with outgoing mail being allowed to be sealed, whereas all incoming mail is subject to inspection before delivery to the inmate. Moreover, this is the view of the warden, who promulgated the regulation. Consequently, we do not believe that the defendant knew or should have known, based on the regulation, that the envelope given to a guard for hand delivery to another inmate was subject to being opened and the contents read. Rather, the case must be treated as one where there was no regulation or practice

made known to the inmates regarding correspondence between inmates in the institution.

Nevertheless, the Court recognized that, "as a general matter, lawful detention or imprisonment 'necessarily makes unavailable many rights and privileges of the ordinary citizen,' but 'though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections.'" *Id.* at 463, 404 A.2d 257 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Indeed, the Court acknowledged that "some courts have taken the position that persons incarcerated in jails and prisons retain a measure of Fourth Amendment protection." *Id.* (citations omitted). Yet, with respect to the Fourth Amendment, the Court observed, *id.*: "[I]t is not at all clear whether the protections of that amendment extend to pre-trial detainees or convicted prisoners in a detention center or correctional institution." It pointed to the Supreme Court's then-recent observation in *Bell v. Wolfish, supra,* 441 U.S. at 556–57, 99 S.Ct. 1861, that "an argument can be made 'that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person.'" *Id.* And, quoting *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), the Court observed, *id.*, that "'surveillance has traditionally been the order of the day'" in penal institutions.

Mindful that "[t]he Supreme Court has not decided the question," *id.* at 464, 404 A.2d 257, the *Thomas* Court "similarly assume[d], without deciding, that a pretrial detainee ... retains some reasonable expectation of privacy and thus a degree of Fourth Amendment protection." *Id.* But, the Court admonished: "[M]erely because inmates may retain a degree of Fourth Amendment protection with respect to some matters, it does not necessarily follow that the defendant in the present case had a reasonable expectation of privacy with respect to the contents of the sealed envelope handed to the

correctional officer." *Id.* Relying on *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861, the Court reasoned:

> In that part of the *Bell v. Wolfish* opinion relating to the Fourth Amendment claims of pre-trial detainees, the Supreme Court seemed to be saying that, even assuming the presence of some reasonable expectation of privacy with respect to the subject of a search, resulting in the Fourth Amendment being implicated, if the type of search is justified by institutional security considerations, no "level of cause" for any specific search is required for compliance with the Fourth Amendment. Instead, the "significant and legitimate security interests" of the detention facility may outweigh the privacy interests of the pre-trial detainees, thereby rendering the searches "reasonable" within the meaning of the Fourth Amendment.
>
> Applying these principles to the case before us, it would seem apparent that no Fourth Amendment right of the defendant was violated. *Assuming that [Thomas] had some reasonable expectation of privacy with regard to the envelope because of the absence of notice informing him that the contents would be inspected,* under *Bell v. Wolfish, supra,* no "probable cause" or "reasonable suspicion" that the envelope contained contraband, escape plans, etc., need be shown. Rather, *the question is whether this type of search is justified by the institution's legitimate concern for security. There can be little doubt that it is so justified. A detention center or correctional institution clearly has a reasonable security interest in knowing what one inmate is communicating or sending to another. Sealed envelopes from one inmate to another may contain contraband,* and letters in such envelopes may embody escape plans or plans for the disruption of the institution.

*Id.* at 467–68, 404 A.2d 257 (citation omitted) (emphasis added).

We have not uncovered any Maryland decision since *Thomas* that has revisited the issue of the extent of an inmate's Fourth Amendment protection with respect to his non-privi-

leged mail.[7] But, cases in other jurisdictions have uniformly reached results consistent with *Thomas.*

In *Commonwealth v. Moore,* 928 A.2d 1092 (Pa.Super.Ct.2007), an appellate panel of the Pennsylvania Superior Court agreed with the State's claim that the trial court erred in suppressing an inmate's non-privileged incoming and outgoing mail. *Id.* at 1094. The court determined that, under both federal and Pennsylvania law, which are coextensive, the defendant did not have a legitimate expectation of privacy in the mail. *Id.* at 1099, 1102. In its analysis under Pennsylvania law, the court said, *id.* at 1102:

> The policy considerations animating the Commonwealth's issue are basic and quickly discerned: "Although prison walls do not separate inmates from their constitutional rights, because of the unique nature and requirements of the prison setting, imprisonment 'carries with it the circumscription or loss of many significant rights ... to accommodate a myriad of institutional needs...chief among which is internal security.'" *Payne v. Commonwealth Dept. of Corrections,* 582 Pa. 375, 399, 871 A.2d 795, 809 (2005) (quoting *Small v. Horn,* 554 Pa. 600, 722 A.2d 664, 669–70 (1998)). Prisoners have used the mail to transport contraband into and out of prison, to discuss and participate in ongoing criminal activity, and to coordinate escape plans. *See [United States v.] Solomon, supra* [2007 WL 1099097 (W.D.Pa. 2007) ]. An unrestricted privacy interest in non-privileged mail would assist criminal objectives by facilitating the transmission of information. *See id.* On the other hand, prisoners must appreciate the inherent loss of privacy in a prison, where security and surveillance obviate any legitimate expectation of privacy. *Id.*

---

7. "[M]ail is considered privileged if it is addressed to or from judges, courts, elected government officials, prison officials, parole board members, or attorneys." *Smith v. Delo,* 995 F.2d 827, 829 n. 2 (8th Cir.1993). In this case, appellant does not argue that the mail in question was privileged. Therefore, we shall refer to his mail as "non-privileged."

*Commonwealth v. Thompson*, 934 A.2d 1281 (Pa.Super.Ct.2007), *appeal denied*, 596 Pa. 744, 946 A.2d 687 (2008), is also helpful. Like the instant case, it involved the reading of a non-privileged letter sent by an inmate, marked "return to sender." *Id.* at 1284. The contents were admitted at the defendant's trial on charges of attempted homicide and aggravated assault. *Id.* at 1282, 1285. The appellate court rejected the defendant's contention that such mail could be opened but not read. *Id.* at 1286. It cited prison policy to "open, examine, and read the contents of any letter that has been returned to sender." *Id.* at 1285, 1286 n. 5; *see also Tankleff v. Senkowski*, 3 A.D.3d 621, 770 N.Y.S.2d 769, 770 ("When the envelope in question was returned for insufficient postage, it became subject to inspection by regulation"), *appeal denied*, 2 N.Y.3d 703, 778 N.Y.S.2d 461, 810 N.E.2d 914 (2004).

*United States v. Whalen*, 940 F.2d 1027, 1034–35 (7th Cir.), *cert. denied*, 502 U.S. 951, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991), is also pertinent. In that case, prison officials read two outgoing letters in which the defendant admitted cutting a man's throat. *Id.* at 1034. The Seventh Circuit rejected the prisoner's contention that the Fourth Amendment required suppression of the letters. *Id.* at 1035. The court reasoned, *id.* at 1034–35:

> Mr. Whalen suggests that a prison must notify a prisoner that his outgoing mail will be read for a prisoner to have no legitimate expectation of privacy worthy of protection under *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The government contends that the line of precedent beginning with *Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), precludes acceptance of Mr. Whalen's argument. In *Stroud*, the Supreme Court held that interception by prison officials, and subsequent use in prosecution, of letters written by an inmate did not violate the prisoner's fourth amendment rights. Modern cases have limited *Stroud* to situations in which prison officials have seized outgoing letters in the exercise of legitimate government interests. *See United States v. Brown*, 878 F.2d 222, 225 (8th Cir.1989); *Meadows v. Hop-*

*kins,* 713 F.2d 206, 208–11 (6th Cir.1983). Thus, *Stroud* "still controls cases in which such seizures are prompted by reasonable justification." *Brown,* 878 F.2d at 225.

"[B]ecause of their reasonable concern for prison security and inmates' diminished expectations of privacy, prison officials do not violate the constitution when they read inmates' outgoing letters." *Id.; see also United States v. Kelton,* 791 F.2d 101, 102–03 (8th Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586 (1986). FCI–Oxford officials are permitted to examine inmates' outgoing mail to ensure that the mail does not interfere with the orderly running of the prison, contains no threats, and does not facilitate criminal activity. *See* 28 C.F.R. § 540.14(b). In short, it is well established that prisons have sound reasons for reading the outgoing mail of their inmates.

In *Witherow v. Crawford,* 468 F.Supp.2d 1253, 1256 (D.Nev. 2006), Nevada prisoners brought an action under 42 U.S.C. § 1983, alleging a violation of their rights based on alleged improper censoring of mail and institutional failure to adhere to administrative process. Outgoing mail, incoming mail, and inmate-to-inmate correspondence were all at issue. *Id.* at 1256–57.

The court considered the claim under both the First and Fourth Amendments. *Id.* at 1262–63, 1266–70. It recognized that "[p]risoners have 'extremely limited' Fourth Amendment rights while incarcerated." *Id.* at 1262 (quoting *United States v. Vallez,* 653 F.2d 403, 406 (9th Cir.1981)). Although the court acknowledged that "prisoners have a reasonable expectation of privacy in a sealed letter, *see United States v. Savage,* 482 F.2d 1371, 1373 n. 1 (9th Cir.1973)" it said that "the warrantless seizure of a sealed letter is valid if it serves a 'justifiable purpose of imprisonment or prison security.'" *Id.* at 1270 (quoting *Vallez,* 653 F.2d at 406). In the *Witherow* Court's view,

> there was a legitimate penological reason to intercept the plaintiffs' outgoing and incoming mail, namely, to investigate whether the plaintiffs were bringing illegal drugs into [the prison]. This investigation was "reasonably designed

to promote prison security" by reading the plaintiffs' mail to keep illegal drugs out of the prison and prevent potential criminal behavior.

468 F.Supp.2d at 1270 (quoting *Vallez*, 653 F.2d at 406). Thus, said the *Witherow* Court, there was "no violation of the plaintiffs' privacy rights under the Fourth Amendment." 468 F.Supp.2d at 1270 (footnote omitted).

In *United States v. Kelton*, 791 F.2d 101 (8th Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586 (1986), prison officials, following regulations, read and copied outgoing letters in which the defendant incriminated himself. *Id.* at 102. The Eighth Circuit wrote, *id.* at 103:

> It is apparent ... that the actions of the prison officials were justified in light of the legitimate objectives of the prison system. In *Lyon v. Farrier*, 727 F.2d 766, 769 (8th Cir.1984), this court held that, although prisoners retain some fourth amendment rights while in prison, these rights are limited by institutional security needs and the prisoner's reduced expectation of privacy.

*See also Busby v. Dretke*, 359 F.3d 708, 716 (5th Cir.) (recognizing, in a habeas corpus case, the "prevailing view" that "there is no constitutional violation" in reading detainee's outgoing mail), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Stow v. Grimaldi*, 993 F.2d 1002, 1004 (1st Cir.1993) (holding that a "New Hampshire State Prison practice of requiring non-privileged outgoing mail to be submitted for inspection in unsealed envelopes" does not violate prisoners' constitutional rights); *Smith v. Delo*, 995 F.2d 827, 832 (8th Cir.1993) (holding prison officials were justified in screening outgoing non-legal mail for escape plans, contraband, threats, or evidence of illegal activity), *cert. denied*, 510 U.S. 1052, 114 S.Ct. 710, 126 L.Ed.2d 676 (1994); *Smith v. Shimp*, 562 F.2d 423, 426–27 (7th Cir.1977) (reasoning that when a pretrial detainee sends non-privileged mail, "he knowingly exposes [same] to possible inspection, by jail officials and consequently yields to reasonable search and seizure"); *United States v. Baumgarten*, 517 F.2d 1020, 1027–28 (8th Cir.) (holding that, under circumstances where warden "read, cop-

ied and disseminated" letter to police pursuant to official policy of reading prisoners' incoming mail, prisoner cannot say the State gained access to contents of a letter by unlawful search and seizure), *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975).

Moreover, several state courts have concluded that the Fourth Amendment does not provide prisoners with an expectation of privacy in their mail. *See, e.g., Bowen v. State,* 342 Ark. 581, 30 S.W.3d 86, 89, 90 (2000) (holding pretrial detainee has no reasonable expectation of privacy in his mail, even when prison offered no notice it would inspect prisoner's mail); *People v. Harris,* 83 Cal.App.4th 371, 99 Cal.Rptr.2d 618, 620–21 (2000) (holding prisoner has no expectation of privacy in his non-privileged mail); *People v. Garvey,* 99 Cal.App.3d 320, 160 Cal.Rptr. 73, 74 (1979) (same); *People v. Whalin,* 885 P.2d 293, 295 (Colo.Ct.App.1994) ("the majority view is that correctional officials may examine an inmate's nonlegal mail"), *cert. denied,* 1994 Colo. LEXIS 863 (Colo. Nov. 29, 1994); *State v. Hawkins,* 70 Wash.2d 697, 425 P.2d 390, 395 (1967) ("[F]or very obvious security reasons, practically every jail and penal institution examines the letters and packages, incoming and outgoing, of all inmates. Certainly, there can be no claim of invasion of privacy under such circumstances."), *cert. denied,* 390 U.S. 912, 88 S.Ct. 840, 19 L.Ed.2d 883 (1968).

Other states have suggested that notice to a prisoner that mail is subject to inspection vitiates a prisoner's expectation of privacy in his mail. *See, e.g., State v. Martin,* 77 Conn.App. 778, 825 A.2d 835, 849 (concluding that because department of corrections notified defendant that his mail would be read, he had no reasonable expectation of privacy in his letters), *appeal denied,* 266 Conn. 906, 832 A.2d 73 (2003); *State v. Wiley,* 355 N.C. 592, 565 S.E.2d 22, 32–33 (2002) (because defendant had notice that mail was subject to scrutiny, defendant had no reasonable expectation of privacy in mail), *cert. denied,* 537 U.S. 1117, 123 S.Ct. 882, 154 L.Ed.2d 795 (2003); *Merritt v. State,* 982 S.W.2d 634, 635 (Tex.App.1998) (because inmate handbook notified appellant that his mail would be censored, defendant had no reasonable expectation of privacy).

The treatise, Michael Mushlin, *Rights of Prisoners*, §§ 13:2–13:4 at 667–84, (3d ed. 2002) ("Mushlin"), is also noteworthy. There, the author reviews the historically distinct treatment of inmate claims for protection of incoming and outgoing mail under the First Amendment's guarantee of freedom of speech. But, the First Amendment was not invoked in this case. The treatise also considers the issue under the Fourth Amendment, which is at issue here. *See id.* As Mushlin points out, in *Wolff v. McDonnell, supra,* 418 U.S. at 576, 94 S.Ct. 2963, the Court discussed opening of privileged mail, and recognized that " 'freedom from censorship is not freedom from inspection or perusal.' " "Thus," asserts Mushlin, "courts have invariably allowed prison officials to open incoming mail for this purpose." § 13.3, at 675 (footnote omitted). *See also* William E. Ringel, *Searches & Seizures, Arrests and Confessions*, § 17:13 (2d ed. 2008) ("Officials at many penal institutions routinely open and read all outgoing and incoming correspondence. Although the seizure and opening of . . . mail falls within the ambit of Fourth Amendment protection, the Fourth Amendment has not played a prominent role in prison mail decisions. Instead, most cases have been decided on First Amendment grounds.") (footnote omitted).

Based on the foregoing authorities, we are satisfied that Mitchell's actions in opening the envelope and unfolding the papers inside it did not offend appellant's rights under the Fourth Amendment. Mitchell testified as to the institutional policy of routinely inspecting incoming mail for contraband. Moreover, she explained that the envelope in issue was unusually thick and could have contained "some type of drugs." She also testified that her action was motivated by official policy that deems returned mail as incoming mail; the policy barring correspondence between inmates; and the practice of some inmates in sending mail to other inmates by using bogus mailing addresses in combination with the return address of the intended recipient.[8]

---

8. As the State points out, that inmate practice, called "kiting," has been recognized elsewhere. *See DiRose v. McClennan,* 26 F.Supp.2d 550,

■ The question remains whether the court had sufficient grounds for finding that Mitchell acted reasonably when she *read* the letter after she opened it. We see two routes leading to the conclusion that it did.

First, in *Thomas*, 285 Md. 458, 404 A.2d 257, even if the defendant had some privacy expectation in his letter to another inmate because there was no official notice that it would be read, the Court determined that such an expectation was "outweighed by the legitimate security needs of the detention center," which extended to "knowing what one inmate is communicating to another," which might involve plans to escape or disrupt the institution. *Id.* at 468–69, 404 A.2d 257. Here, likewise, the institution had a need to read the letter to investigate the possibility, established by Mitchell's testimony, that the letter was an improper communication between inmates.

Second, Mitchell reasonably perceived the autopsy photograph as unusual and "suspicious." [9] Appellant argues that the photograph "was not evidence that Appellant was engaged in any criminal activity while in the detention facility," and that he could have received the copy legitimately from his attorney. But, Mitchell was not required to ignore the photo on that basis. It was not unreasonable for Mitchell to suspect that the envelope may have contained information relating to his continuing criminal activity. Mitchell's suspicion, prompted by the photo, entitled her to read the letter, which led to the discovery of appellant's statement that the photo depicted his "victim." [10]

---

552 (W.D.N.Y.1998) ("The facility opened the returned mail to prevent contraband from entering the prison and to prevent the practice of 'kiting,' where a letter is deliberately provided with insufficient postage and the return address is not that of the actual sender of the letter, but another inmate.").

**9.** It bears noting that the photograph, although dark, has a dramatic impact at first glance because it is a close-up view of the victim's face.

**10.** In his brief, appellant includes an additional, perfunctory claim that the letter was inadmissible because it contained evidence of "other

## II.

■ Appellant argues that the evidence was legally insufficient to support his convictions "because the testimony of the two eyewitnesses was unreliable and because no tangible evidence linked him to the shooting." A threshold problem afflicts appellant's argument. On two occasions, defense counsel moved for judgment of acquittal. But, neither time did defense counsel state any grounds for the motion. In *McIntyre v. State*, 168 Md.App. 504, 527, 897 A.2d 296 (2006), we wrote,

> In *Fraidin v. State*, 85 Md.App. 231, 244–45, 583 A.2d 1065 (1991), Judge Moylan, speaking for this Court, said:
>
> > In a jury trial, the only way to raise and to preserve for appellate review the issue of the legal sufficiency of the evidence is to move for a judgment of acquittal on that ground. Under Md. Rule 4–324(a), a defendant is further required to argue precisely the ways in which the evidence should be found wanting and the particular elements of the crime as to which the evidence is deficient. In *State v. Lyles*, 308 Md. 129, 135, 517 A.2d 761 . . . (1986), the Court of Appeals held clearly that a defendant is "required to state with particularity all reasons why his motion for judgment of acquittal should be granted." "Moving for judgment of acquittal on the grounds of insufficiency of the evidence, without argument, does not preserve the issue for appellate review." *Parker v. State*, 72 Md.App. 610, 615, 531 A.2d 1313 . . . (1987).

Even if preserved, appellant's contention is devoid of merit. We agree with the State, which asserts: "Sparkman is not entitled to a reversal of his convictions because the evidence of his criminal agency was more than sufficient to permit a rational trier of fact to conclude that he shot and killed Pritchett on the evening of the 14th of January, 2005."

---

crimes wholly independent of the crimes for which Appellant was on trial. . . ." It stated: "I went to prison at a young age & back I am." This claim was not made below and thus is not preserved for our review. *Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999).

In assessing the legal sufficiency of evidence at trial, we view it "in the light most favorable to the prosecution," considering whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003); *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We defer to the jury's "opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence[.]" *Pinkney v. State*, 151 Md.App. 311, 329, 827 A.2d 124, *cert. denied*, 377 Md. 276, 833 A.2d 32 (2003); *see Owens v. State*, 170 Md.App. 35, 101–02, 906 A.2d 989 (2006), *aff'd*, 399 Md. 388, 924 A.2d 1072 (2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008).

Appellant's complaint that the eyewitnesses' testimony was "unreliable" is nothing more than a credibility assessment. Both Gilliam and Minor testified that they saw the shooting and recognized appellant, and both identified him in court as the shooter. The testimony of even one eyewitness will support a conviction; the testimony here was more than sufficient to support the jury's verdict, even without the self-inculpatory letter. *See, e.g., Braxton v. State*, 123 Md.App. 599, 671, 720 A.2d 27 (1998).

Appellant closes this point with a separate, unpreserved argument—that the letter was "not conclusively shown to have been written by Appellant," as "no handwriting comparison was attempted." He bolsters this claim with the observation that Corporal Mitchell testified at trial about the inmate practice of using the "return to sender" process as a means to exchange prohibited inmate-to-inmate mail. Thus, he reasons that another inmate might have written the letter and tried to send it to him in this devious way. The hypothetical possibility that another inmate, posing as appellant, wrote the admission was not raised below. In any event, it would not defeat the eyewitness testimony that appellant was the murderer.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**