**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Raymond Craig WILSON, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Wilbert POLK, Defendant-Appellant.**

**Nos. 71–1054, 71–1055.**

United States Court of Appeals,
Ninth Circuit.

Aug. 16, 1971.

Edward I. Bloom (argued), Oakland, Cal., for appellant Wilson.

Charles F. Wilkinson (argued), of Bronson, Bronson & McKinnon, San Francisco, Cal., for appellant Polk.

Mallory Walker, Asst. U. S. Atty. (argued), Sidney I. Lezak, U. S. Atty., Portland, Or., for appellee.

Before HAMLEY and KOELSCH, Circuit Judges, and BYRNE,* District Judge.

WILLIAM M. BYRNE, District Judge:

On March 6, 1970, at approximately 2:00 P.M., Dean Antone entered the Eugene Branch of the Oregon Bank of Portland (sometimes referred to as "the bank"), approached a teller window and ordered the teller on duty to empty her purse of its contents and to replenish it with money. After having fled the scene of the robbery by running "through an alley," Antone threw the "money bag" "into the bushes" near a white building and then "hopped into [an awaiting] car" driven by Patricia Dawson. Dawson drove Antone to his dormitory on the campus of the University of Oregon and then returned to the apartment she shared with Polk and Wilson and the latter's brother, Stewart. At a jury trial, appellants were found guilty of inducing, aiding and abetting the said bank robbery, a violation of 18 U.S.C. §§ 2 [1] and 2113(a).[2]

The appellants testified in their own defense. Their testimony was couched in exculpatory claims of innocence and assertions that Dawson was the instigator and co-ordinator of the bank robbery in issue. As indicated by the verdict, the triers of fact failed to lend credence to this testimony. Accordingly, we are bound on appeal to view the evidence in the light most favorable to the government. Glasser v. United States, 315 U. S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Zumpano, 436 F.2d 535 (9th Cir. 1970); Kay v. United States, 421 F.2d 1007 (9th Cir. 1970). This evidence is set forth below.

On the afternoon of March 5, 1970, Polk encountered Antone in an inebriated condition outside the University of Oregon Student Union. Antone entered Polk's car and the two drove to Polk's apartment. Shortly after arriving at the apartment, Polk took Antone into the bedroom. They were joined immediately by Wilson, who was being visited by Terry McJunkin. Two hours later Wilson emerged from the bedroom and announced to McJunkin that "they were planning a bank robbery."

That evening, Dawson went to Portland without telling her boy friend Polk, with whom she had been "hassling." Acting upon the advice of two companions, Dawson telephoned Polk and told him where she was. Upon learning of Dawson's whereabouts, Polk, who "seemed to get mad," told his estranged girl friend that "if [she] wanted any of [her] things * * * [she] better be back by morning."

Arriving in Eugene by bus the following morning, Dawson was met by Polk, who upon leaving the bus depot, drove by the local branch of the Oregon Bank of Portland. As they drove by, Polk related his intent to rob the bank "before noon." Polk then drove to the end of an

---

* Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation.

1. 18 U.S.C. § 2 provides in pertinent part:
   "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

2. 18 U.S.C. § 2113(a) provides in pertinent part:
   "Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank * * * or
   "Whoever enters or attempts to enter any bank, * * * or any building used in whole or in part as a bank, * * * with intent to commit in such bank, * * * any felony affecting such bank * * * and in violation of any statute of the United States, or any larceny—
   "Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

alley directly across from the bank. It was here that Dawson learned she was to be parked waiting for Antone to make his "get away" from the bank. Before entering the car, Antone would, Polk informed Dawson, toss the purse filled with money into the bushes near a white apartment building. The purse was to be retrieved shortly after the commission of the robbery.

Back at the apartment, Polk accused Dawson of making "a fool out of him." In order "to make up for * * * [the] wrong [she] had done," Polk told her that she must go through with the bank robbery as he had outlined. Otherwise, he warned, she would "pay". Dawson was certain she "knew what he meant by that."

Once Dawson's commitment to the plan was secured, events occurred in rapid succession. Pursuant to Wilson's instructions, Dawson was able to obtain, by chicanery, an automobile from a nearby used car lot. Having gained possession of an automobile, Dawson and Antone, who elected not to wear women's clothing and a wig as originally planned, set out for the bank. They were followed by Wilson, his brother Stewart and Polk in a white Chevrolet Impala borrowed from Polk's friend Jill Hanna.

Within minutes of the robbery, the Wilsons and Polk entered the bank and were immediately approached by Wayne Irvin, an "employee" of the Eugene Police Department. After Irvin had answered their inquiry about the commotion inside the bank, the three volunteered they had seen "a honkey" chasing an Indian "down the alley from the bank." All three expressed a desire to leave the premises in order that they might aid in the robber's capture and thus claim any reward that might be offered.

As the three young men talked, Irvin noted a sense of anxiety in their manner. Accordingly, he asked each of them his name. The trio responded by giving fictitious names.

Upon returning to the apartment, Wilson was enraged that the police had recovered the purse. Because the police had a description of Antone, Wilson asked McJunkin to cut Antone's long hair. Wilson then "ripped up" the blue jacket Antone had worn and went downstairs to burn the torn pieces.

Because both appellants claim distinct and unrelated errors, we will discuss separately the contentions of each.

*Polk's Appeal*

Immediately prior to setting out for the bank, Polk produced a gun and instructed Dawson "to put it into [her] purse and give it to Antone before he went in." Although Dawson complied with Polk's instructions, the gun was not needed to execute the crime. Antone committed the robbery without having to brandish the weapon. At the trial, the gun was marked for identification, but was not introduced into evidence. On appeal, Polk maintains that it was prejudicial error to have permitted the jury to view and to hear testimony about a gun which had been obtained "as a result of an illegal search and seizure."

Contrary to Polk's view, we are of the persuasion the gun was lawfully secured by the authorities. The day following her arrest, Dawson "took" members of the Lane County Sheriff's Department to the apartment. Once inside, she disclosed to Detective Roy Dirks that the gun used in the robbery "had been there." At the trial, in response to the government's inquiry about whether she had consented to the search, Dawson replied in the affirmative.

Polk maintains that *Cipres v. United States*, 343 F.2d 95 (9th Cir. 1965), buttresses his position that the evidence adduced at trial does not establish that Dawson voluntarily consented to the search of the apartment. In *Cipres*, the defendant who had been detained at an airport departure gate by customs officials, was told that a narcotics investigation was being conducted and that it was believed her luggage contained mar-

ihuana. Cipres proclaimed she had "nothing to hide" but asserted the bags could not be opened because she had left the keys in New York City. In fact, the bags were unlocked, and upon their opening, the belief of the customs officials was confirmed.

Under the circumstances of that factual setting, the court was of the view that evidence of "verbal expression of assent" was not sufficient to establish that the defendant "had waived her constitutional immunity from unreasonable search and seizure." The "circumstances" which led the court to this view are as follows:

" * * * it (the verbal consent) was coupled with the statement that the bags were locked and the keys unavailable, which on its face would have rendered the consent ineffectual; it was accompanied by assertions that Cipres was innocent and that the suitcases contained innocuous articles and not marihuana, assertions certain to be exposed as false the moment the bags were opened; and admittedly Cipres asked if the officers had a search warrant." 343 F.2d at 98.

The coercive circumstances which necessitated the finding in *Cipres* that the defendant's "verbal consent" to the search did not constitute a waiver of her constitutional right are clearly not present in the instant controversy. Here, the record indicates that immediately following her arrest, Dawson was determined to cooperate with the authorities. For example, the day following her arrest, she "took" the sheriff to the apartment. Dawson's use of the word "took", which in the context of her testimony is free of any coercive overtone, was hardly ill chosen. After disclosing to the sheriff her belief that the "gun that was used in the bank robbery" was in the apartment, Dawson consented to the search which led to its discovery. Her cooperative manner continued at the trial when she testified as a government witness. Thus here, unlike in *Cipres* and Schoepflin v. United States, 391 F.2d 390 (9th Cir. 1968), cert. de-nied, 393 U.S. 865, 89 S.Ct. 146, 21 L. Ed.2d 133 (1968), another case upon which Polk primarily relies, the authorities did not suggest to the consenting party that she was believed to be harboring the matter which was the object of the search. In our view, this distinction is significant because it underscores the aura of voluntariness which surrounds Dawson's decision to permit the authorities to search the apartment for the "gun that was used in the bank robbery * * *".

As an adjunct to his contention that the search violated his constitutional right against unreasonable searches and seizures, Polk charges that Dawson was without "authority to consent to a search of the apartment * * *". The basis of this argument is that as the paying tenants, only he and appellant Wilson were empowered to give such consent.

At the time of the robbery, Dawson stated that she was living in the appellants' apartment. Another principal in this case, Stewart, also lived in the apartment. Dawson acknowledged that only Polk and Wilson paid rent. According to Polk, this was the second apartment he had shared with Dawson. Polk estimated that Dawson had lived in the apartment for "about three months or two months, somewhere around there."

It belabors the obvious to point out that in the parlance of the day, Dawson and Polk were "living together" in a common-law status. The record indicates that Dawson had unrestricted accessibility to the apartment. Indeed, the totality of this "arrangement" is evidenced by Dawson having her "things" at the apartment. Under such circumstances, Dawson had equal rights to the use and occupation of the premises at the time she consented to the search. It is well settled, one endowed with such rights may authorize a search of the premises, and the evidence thus disclosed can be used against his co-habitant. United States v. Wixom, 441 F.2d 623 (7th Cir. 1971); United

States v. Hughes, 441 F.2d 12 (5th Cir. 1971); Pasterchik v. United States, 400 F.2d 696 (9th Cir. 1968), cert. denied, 395 U.S. 982, 89 S.Ct. 2142, 23 L.Ed.2d 770 (1969); Wright v. United States, 389 F.2d 996 (8th Cir. 1968). Accordingly, we are satisfied that because of the nature of the rights which had accrued to Dawson by reason of her sharing an apartment with Polk, the search in issue is impervious to the claim that it is tainted by illegality. See United States v. Airdo, 380 F.2d 103 (7th Cir. 1967), cert. denied, 389 U.S. 913, 88 S. Ct. 238, 19 L.Ed.2d 260 (1967), where the court held that the defendant's mistress with whom he shared an apartment acted with complete propriety when she consented to a search of the premises. Accord, Nelson v. People of State of California, 346 F.2d 73 (9th Cir. 1965), cert. denied, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965).

■ Also, we cannot agree with Polk that the gun found in his apartment was unrelated to the crime for which he was charged with having committed. Although Polk was not accused of armed robbery, he was indicted for inducing, aiding and abetting the bank robbery committed by Antone and Dawson. According to Dawson, immediately prior to her departure for the bank, Polk produced the gun in question and informed her that Antone was to have it on his person when he entered the bank. It defies logic to assert that such an instruction is not related to the crime for which Polk was charged. Merely because Antone found it unnecessary to display the weapon during the robbery does not mean that Polk's action did not constitute aiding and abetting the robbery.

■ In any case, we can detect no prejudice resulting from the gun's seizure. At the trial, the gun was marked as a government exhibit. Although it was shown to two witnesses (Antone and Dawson) for identification, it was not introduced into evidence. Polk made no objection to the fact that the jury had observed an item which had not been placed into evidence. His failure to object, no doubt, was attributable to the inconsequential import the gun was to the establishment of the government's prima facie case. In a remarkably similar factual situation, the Eighth Circuit deemed such a claim of reversible error "frivolous." Mee v. United States, 316 F.2d 467, 470 (8th Cir. 1963), cert. denied, 377 U.S. 997, 84 S.Ct. 1923, 12 L. Ed.2d 1049 (1964), reh. denied, 379 U.S. 873, 85 S.Ct. 20, 13 L.Ed.2d 80 (1964). There, the defendant had been charged with conspiracy to commit mail fraud by feigning a burglary and then making false insurance claims. At trial, the government displayed, as an exhibit *only,* items that had been buried near the scene of the feigned burglary. Several witnesses including the appellant gave testimony about the articles which made up the exhibit. No objection was made about the exhibit having been brought into the courtroom or to the government's failure to have moved its admission into evidence.

We agree with the Eighth Circuit's view that in such a context, the failure to introduce the exhibit into evidence does not constitute error, let alone prejudicial error.

■ Equally wanting is Polk's contention "reversible error" was committed when Dawson stated that the gun in question had been "used in other cases." It is not without significance to our disposition of this matter that the record's *sole* reference to the commission of other crimes does not specifically refer to *this* appellant. Indeed, Dawson continued her testimony by indicating the search for the gun was conducted by "lifting up" *Wilson's* mattress. We are satisfied that this isolated allusion to other criminal acts, which the trial court accurately labeled "An innocuous statement," did not influence the verdict reached by the jury. Cf. Courtney v. United States, 390 F.2d 521 (9th Cir. 1968), cert. denied, 393 U.S. 857, 89 S. Ct. 98, 21 L.Ed.2d 126 (1968), reh. denied, 393 U.S. 992, 89 S.Ct. 440, 21 L. Ed.2d 457 (1968).

Following his arrest, Polk was incarcerated at Rocky Butte Jail in Portland. During his confinement, he wrote a letter to Jill Hanna. Pursuant to the practice of inspecting outgoing mail of federal prisoners, a United States Marshal examined the letter and made a photo copy before it was mailed. At trial, Hanna, who acknowledged receiving the letter, was unable to comply with a subpoena duces tecum because the letter had been "thrown away." She attested to the fact that the photo copy of the letter made by the Marshal was a "true and correct" copy of the letter she had received from Polk. After all the immaterial portions had been deleted, the letter was admitted into evidence without objection. Now, for the first time, Polk maintains that the contents of the letter "although ambiguous, could be construed as admissions."[3] Acordingly, he argues that his Fourth and Fifth Amendment rights were violated because these "admissions" were made "involuntarily."

Conditions of confinement dictated that Polk resort to subterfuge in order to convey this type of message "to the outside." It seems clear from his letter to Hanna that he feared "P.P.'s" cooperation with the authorities. In light of this situation, Polk wanted to let "him" know what would happen if "P.P." continued "to blow her cool." Anticipating the worst, Polk set forth two statements which apparently were to constitute the basis of testimony to be given by unnamed defense witnesses. Each statement discredited "her" and absolved "him" of any criminal culpability.

■ The deliberate usage of oblique language has not rendered the purpose of this letter opaque. The thrust of Polk's communication was to influence the testimony of a prospective witness. That such conduct constitutes an admission is well settled. See, e. g., Segal v. United States, 246 F.2d 814 (8th Cir. 1957), cert. denied, 355 U.S. 894, 78 S. Ct. 269, 2 L.Ed.2d 192 (1957).

■■ Our agreement with Polk as to the nature of the letter's contents does not extend to his contention that the admissions were not free and voluntary. As indicated, it was the "practice" of the Marshal's Office to inspect the outgoing mail of prisoners prior to posting. The guarded language which pervades this letter strongly indicates Polk was aware of this "practice." The letter refers to an event involving the police but shrouds its exact nature in the jargon of the street scene. Save for "P.P.", "Terry", and "Jezabell," Polk avoided the use of proper names to identify the persons who were the subjects of his letter. In short, Polk's meticulous avoidance of detail indicates that he well

3. The admitted portion of Polk's letter to Hanna reads as follows:

"I want him to know what's going to happen if P.P. continues to blow her cool but the way out is for her to back up and say that she was tricked.

"The way things are going to come down in the court room is going to be like this:

"She was afraid of the police and they told her that if she did it that we was going to go down and she would come out on top so she made up part of it and the police made up the other part. The first party made up his part to get some of the weight off him because she didn't really know what was going down, she didn't really know until he told her what he did she was so afraid then she didn't know what to do so she just kept her mouth closed but she knew that she was involved then so when we were arrested she had to lie to take the weight off herself. No. 1 party is backing up too. But, if it don't go down like that it'll go down like this:

"She knew what was happening she told Terry that she was going to get me a whole lot of money but she didn't exactly know how but she was going to do it some kind of way. But Terry didn't know anything about what was going down. She never have seen me do anything to Jezabell. And when she saw that different guy at our apartment Jezabell told her that morning that she was going to use him. When we all came back later on that evening to the apartment she was there by herself. And really that's all Terry can say and she didn't have any knowledge of the incident until we were arrested."

knew this letter would be subjected to official scrutiny before reaching the intended recipient.[4]

### Wilson's Appeal

Prior to commencement of his trial, Wilson stipulated, that on March 6, 1970, the Eugene Branch of the Oregon Bank of Portland was robbed of $1,565. Called as the government's first witness, Dean Antone admitted committing the crime which was the subject of the said stipulation. Antone's direct testimony was limited solely to detailing the mechanics of the robbery. By way of his cross-examination, Wilson elicited from Antone the statement that at the time of the robbery's commission, they did not know each other.

At the close of its case-in-chief, the government "requested" the court to call Antone as its own witness, claiming that it (the government) could not "vouch for his veracity in connection with the events which took place prior to the bank robbery * * *". At first, the court declined, saying it had no question to ask of the witness. The court relented, however, when the government indicated its purpose was to impeach Antone during cross-examination. The government based its need to impeach by cross-examination on an interview with Antone held a few days before trial. At the interview, Antone purportedly made statements which were inconsistent with those he made to the FBI four days after the commission of the robbery. As the court's witness, Antone repeated these inconsistent statements by absolving Polk and Wilson of all culpability in the commission of the robbery. FBI Agent Enyart rebutted this testimony by relating statements to the contrary made by Antone shortly after the robbery.

Wilson claims that the trial court committed an abuse of discretion when it made Antone its own witness because by doing so, the government was able to manipulate the testimony of this witness in its favor. As a witness for the government, Antone's direct testimony related solely to the actual commission of the robbery. In his cross-examination, Wilson, who acknowledges "touching on matters not opened up by the Government on its direct testimony," evoked from Antone that the two did not know each other at the time of the robbery. According to Wilson, the government refused to have Antone made a hostile witness in order "to cross-examine him" because at that stage of the proceedings, it only wanted the jury exposed to testimony favorable to its position. Wilson concludes "that this type of trial tactic was highly prejudicial to him."

In the interest of justice and the ascertainment of truth, it is within the discretion of the trial court to call any witness as the court's witness. See, e. g., Estrella-Ortega v. United States, 423 F.2d 509 (9th Cir. 1970). Equally familiar is the oft repeated statement that a showing of prejudice resulting from an abuse of this discretion must be established before a defendant's conviction will be reversed. See, e. g., Smith v. United States, 331 F.2d 265 (8th Cir. 1964), cert. denied, 379 U.S. 824, 85 S. Ct. 49, 13 L.Ed.2d 34 (1964), reh. denied, 379 U.S. 940, 85 S.Ct. 321, 13 L. Ed.2d 350 (1964). It is within the framework of these established princi-

---

4. The law is settled that prison officials may not, by a practice of mail censorship, deny a prisoner reasonable access to the courts or other basic rights. See, e. g., Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965). In the instant case, it is readily apparent the Marshal's action did not, in any manner, interfere with Polk's "access to the courts." Also, contrary to Polk's view, prison officials may examine the communications of a prisoner without infringing upon his rights. Denson v. United States, 424 F.2d 329 (10th Cir. 1970), cert. denied, 400 U.S. 844, 91 S.Ct. 88, 27 L.Ed.2d 80 (1970). See, also, Cox v. Crouse, 376 F.2d 824 (10th Cir. 1967), cert. denied, 389 U.S. 865, 88 S.Ct. 128, 19 L.Ed.2d 136 (1967), where the court held that the warden's opening, reading and communicating to the state attorney general the contents of a letter written by a prisoner and addressed to his attorney was "allowed by established law." 376 F.2d 826.

ples that the viability of Wilson's assertion of reversible error must be judged.

As indicated, because of the pre-trial interview, the government was not able to claim "surprise" by Antone's cross-examination testimony that he did not know Polk and Wilson at the time he robbed the bank. Similarly, the government's knowledge of Antone's hostility precluded it from making him its own witness and then attempting to impeach his direct testimony. Doss v. United States, 431 F.2d 601 (9th Cir. 1970); Bushaw v. United States, 353 F.2d 477 (9th Cir. 1965), cert. denied, 384 U.S. 921, 86 S.Ct. 1371, 16 L.Ed.2d 441 (1966). Under the circumstances, the government's only recourse was to request the court to call Antone as its witness. Contrary to Wilson's view, this was not a manipulation of evidence, but an honest attempt "to ascertain the truth." Courts have a duty to aid in seeking the truth and to see that justice is not perverted.

■ Assuming arguendo that the trial court abused its discretion when it made Antone its own witness, we see no prejudice. Wilson claims the government employed the tactic of making Antone the court's witness in order to keep from the jury any evidence which would undermine the establishment of its prima facie case. In point of fact, of course, the jury was exposed to such evidence at the outset of the trial. Both appellants, in their cross-examinations, elicited from Antone the statement that the robbery was executed sans any knowledge of their existence. It is difficult to imagine evidence which could more seriously undermine the government's prima facie case. The jury had been exposed to testimony which indicated that the thrust of the government's evidence, i. e., Polk and Wilson induced, aided, and abetted the robbery of the bank, had been refuted by the perpetrator of the crime. Under such circumstances, we are satisfied that the government's trial tactic was neither contrived nor prejudicial.

■ During the course of his cross-examination of Antone, the Assistant United States Attorney made a number of references to the letter written by Polk to Hanna. The prosecutor's examination method was to read or paraphrase a statement from the letter and then question Antone whether Polk or "anyone" had told this to him. Antone replied negatively to each question. Maintaining the government's attorney is guilty of misconduct, Wilson charges that "highly confusing and irrelevant" material "was deliberately interjected into the trial." We disagree.

As already demonstrated, at trial the Assistant United States Attorney was aware that Antone had reversed his position regarding the events surrounding the robbery's commission. Antone's reversal occurred while he was confined in the same jail which housed Polk and Wilson. From this jail, Polk wrote Hanna a letter in which he outlined "The way things are going to come down in the court room * * *". Polk's outline consisted of what the government has dubbed, for lack of a better term, "two plans." "Plan one" dealt with a female witness asserting her innocence and placing the odium of criminality on "the first party." The second "plan" involved the same female witness, only under this version she is saddled with the culpability.

Under these circumstances we find the government's cross-examination to be entirely proper. Dawson, a participant in the bank robbery, testified on behalf of the government. It might be said, to use the words of Polk's letter, Dawson "had blown her cool." Called as a government's witness, Antone, who had been confined with Polk and Wilson, reversed his earlier account of the crime by absolving Polk and Wilson and inculpating Dawson. Clearly, this testimony was consistent with "Plan Two" of Polk's letter. Because an attempt to suborn a witness manifests a consciousness of guilt, United States v. Culotta, 413 F.2d 1343 (2d Cir. 1969), cert. denied, 396 U.S. 1019, 90 S.Ct. 586, 24 L.

Ed.2d 510 (1970), the government acted with complete propriety when it sought to learn from Antone whether his "about face" was attributable to any intimidation. Given the nature of the letter in issue and its relationship to the purpose of the government's cross-examination, we are satisfied that the inquiry to which Wilson objects was appropriate. See, generally, Wilson v. United States, 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896).

The convictions of Polk and Wilson are affirmed.