**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**
**Docket No. 38347**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | **2013 Opinion No. 49** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: September 6, 2013** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| **KEITH ALLAN BROWN,** | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Bonner County. Hon. Fred M. Gibler, District Judge.

Order denying motions to suppress evidence, <u>affirmed in part</u> and <u>vacated in part</u>; and <u>case remanded</u>.

Sara B. Thomas, State Appellate Public Defender; Spencer J. Hahn, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Nicole L. Schafer, Deputy Attorney General, Boise, for respondent.

---

LANSING, Judge

Keith Allan Brown appeals from a judgment of conviction for voluntary manslaughter and accessory to grand theft entered following a conditional guilty plea. Brown challenges the district court's denial of his motions to suppress evidence on the grounds that probable cause for issuance of the warrant for Brown's arrest had dissipated before he was arrested, that his confession to police was involuntary, and that Brown's mail was impermissibly searched while he was incarcerated. Brown also appeals the district court's denial of his motion for reduction of his sentence. We affirm in part, vacate in part, and remand the case.

# I.

# BACKGROUND

This case began in February 2007, when Bonner County sheriff's officers were alerted to an abandoned truck.[1] The keys were with the truck, which was registered to Les Breaw, along with Breaw's wallet, checkbook, legal papers, and several pieces of mail. There were no debit or credit cards in the wallet. When officers checked at Breaw's home, it looked as though he had stepped out and planned to return, but the snow-covered driveway showed no signs of recent traffic. Concerned for Breaw's safety, the officers began investigating to determine when he was last seen. They were told by a neighbor that one of Breaw's other neighbors, Keith Brown, was last seen hurriedly packing for a trip around the time Breaw was last seen, and that Brown had not been seen since. Officers also learned that neither Brown, who worked for Breaw, nor Brown's wife, Tyrah Brown, had picked up their most recent paychecks. While investigating Breaw's recent bank card activity, officers also discovered a security video from a local store which appeared to show Brown using Breaw's debit card. When the store clerk was later asked about the incident, the clerk remembered it clearly because Brown did not know how to use the debit card and did not know the debit card's pin number.

Because of the suspicious circumstances surrounding Breaw's and Brown's disappearance and the possibly illegal debit card activity, an officer applied to a magistrate for a search warrant and a warrant to arrest Brown for theft of the debit card. The officer testified in support of the warrant, and gave the magistrate the details of the suspicious use of the debit card and the circumstances surrounding Breaw's and Brown's disappearance. He also reported to the magistrate that both Brown and Tyrah had extensive criminal records, including arrests for identity theft. After considering the evidence, the magistrate found probable cause, and both a search warrant for the Brown residence and a warrant authorizing Brown's arrest for grand theft were issued on February 7, 2007.

Although the arrest warrant was issued on suspicion of only theft of the bank card, over the next few weeks officers uncovered more incriminating information about Brown and Tyrah, including information that an escrow check for $50,000 payable to Breaw had been deposited

---

[1] Because there was no trial, the background facts recounted here are gleaned elsewhere from the record presented in this appeal, primarily from the preliminary hearing transcript, police reports and depositions.

into a bank account held by Tyrah. Tyrah had opened the account on January 22, 2007, and deposited the check two days later. Within a week, all of the $50,000 had been withdrawn from the account. Officers also learned that around the time of the suspicious debit card transaction, a man and woman had gone to some of Breaw's renters to collect rent, allegedly on behalf of Breaw. One renter who had paid in cash remembered the incident because Breaw called the next day claiming that he had never received the rent money. Officers learned from Tyrah's co-workers that she had made inconsistent statements about Breaw having travel plans. She told one individual that the Browns were going to take Breaw to the airport in Seattle, from which he would fly to Thailand to pick up a sailboat, and told another person that the Browns were going to drive Breaw to Oregon.

As part of the investigation, an officer contacted Tyrah's mother, Rebekah Harding. Harding said that she had left with the Browns in late January, but Brown purchased a new car in Montana and left Harding with Brown's old car at a hotel. During Harding's initial conversation with an officer on February 8, she was reluctant to believe that anything illegal had occurred. She said that Breaw was not missing because he had gone to California to "dig clams" and visit his mother. She also said that Brown had permission to use Breaw's debit card, and explained that Breaw was a poor bookkeeper, so the incident with missing rent money had been a misunderstanding. The next day, however, Harding called the officer because of a phone call that she received from Tyrah earlier that morning. Harding reported that although the conversation started off casually, when Harding told Tyrah that she had been questioned by a law enforcement officer the preceding day, the phone line went dead. Harding then suspected that Brown had done something to Breaw. Harding eventually admitted that Brown had given her $7,000 before leaving her in Montana.

On March 19, a body was found hidden under a pile of brush and snow a short distance from the location where Brown's truck had been left. Although officers suspected that the body was Breaw, they were not able to confirm the identity until an autopsy on March 21. During the autopsy the missing debit card was found in the decedent's pocket.

On March 20, the day after the body was found, Brown was arrested in Florida on a fugitive warrant from Idaho. Before he was extradited to Idaho on the grand theft charge, Brown and Tyrah were interviewed by Florida law enforcement officials. In these interviews, the Browns made a number of incriminating statements. When asked about Breaw's $50,000

3

escrow check, Brown claimed that the money was owed to him because of services he had rendered Breaw, but eventually Tyrah confessed to forging Breaw's name on the escrow check. Tyrah also confessed to shooting Breaw and hiding his body. According to Tyrah, she had done it because Breaw had raped her. When Brown was told that his wife had confessed, he also confessed to killing Breaw and told officers that Tyrah was not there. According to Brown, he and Breaw had gone shooting that day, and during the outing Breaw offered Brown the escrow check so that Brown would forgive Breaw for Breaw's sexual misconduct with Tyrah. Breaw continued, however, to make disparaging remarks about Tyrah, which ultimately prompted Brown to shoot Breaw. Brown said that he buried Breaw in the snow and hid the murder weapon nearby. Brown even drew a map to the gun's location to persuade officers that Tyrah was not involved. By the next day, however, Brown's story had changed. He recanted his story about killing Breaw and instead told the Florida officers that shooting Breaw had been an accident. He claimed that Breaw had first shot Brown in the leg, which then caused Brown to accidentally shoot Breaw in the head.

Brown was eventually charged with first degree murder, Idaho Code §§ 18-4001, 18-4003(a), being a felon in possession of a firearm, I.C. § 18-3316, and grand theft, I.C. §§ 18-2403, 18-2407(1)(b). Brown filed a number of motions to suppress evidence, including his statements made to Florida police officers and evidence gained from inspection of his mail while he was incarcerated awaiting trial. These motions were denied. Pursuant to a mediated plea agreement, Brown ultimately entered a conditional *Alford*[2] plea to voluntary manslaughter, I.C. § 18-4006(1) and accessory to grand theft, I.C. §§ 18-205, 18-2403(1), and 18-2407(1), retaining the right to appeal any prior adverse rulings of the district court. On appeal, Brown principally challenges the denial of his suppression motions.

## II.

## ANALYSIS

### A.     Validity of Arrest Warrant

Brown first asserts that all evidence obtained as a result of his arrest should have been suppressed because probable cause for the arrest warrant had dissipated before he was arrested. Brown argues that although the evidence presented in support of the warrant application initially

---

[2]     *See North Carolina v. Alford*, 400 U.S. 25 (1970).

demonstrated probable cause to arrest Brown for theft of Breaw's debit card, officers later gained exculpatory information that destroyed that probable cause and failed to disclose it to the magistrate. Brown contends that such disclosure would have led to a determination that there was no longer probable cause for the warrant.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court held that a defendant may challenge the validity of a warrant by making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155-56. When such a showing is made, the Fourth Amendment requires a hearing to determine, by a preponderance of the evidence, whether the statements are indeed false or made in reckless disregard for the truth. *Id.* The *Franks* doctrine applies not only to affirmative falsehoods in a warrant application, but also to a deliberate or reckless omission of material exculpatory information. *State v. Guzman*, 122 Idaho 981, 983-84, 842 P.2d 660, 662-63 (1992); *State v. Rounsville*, 136 Idaho 869, 871, 42 P.3d 100, 103 (Ct. App. 2002). For the defendant to prevail in such a hearing, he or she must prove by a preponderance of the evidence that the false statement was made, or the exculpatory information was omitted intentionally or in reckless disregard for the truth, and that the information in question was material. *Franks*, 438 U.S. at 155-56; *State v. Lindner*, 100 Idaho 37, 41, 592 P.2d 852, 856 (1979). Omitted information is material only if there is a substantial probability that, had the omitted information been presented, it would have altered the magistrate's finding of probable cause. *State v. Peterson*, 133 Idaho 44, 48, 981 P.2d 1154, 1158 (Ct. App. 1999); *State v. Kay*, 129 Idaho 507, 511, 927 P.2d 897, 901 (Ct. App. 1996). The inquiry--whether a statement or omission was intentional or reckless--presents a question of fact, and we will not disturb the lower court's finding without clear error. *Peterson*, 133 Idaho at 47, 981 P.2d at 1157. The second query--whether the statement or omission was material--is an issue of law that we review freely. *Id.*

Here, Brown argues that before he was arrested in Florida, the Idaho officers had acquired information indicating that Brown had not stolen Breaw's debit card or used it without his permission and that this exculpatory information should have been made known to the magistrate, who then would have recognized there no longer existed probable cause to arrest Brown for theft of the card. According to Brown, this newly discovered information included discovery of the missing debit card on Breaw's body, information from a business proprietor

5

who reported seeing Breaw use the debit card two days after Brown was suspected of stealing it, and information from Tyrah's mother, who claimed that Breaw had previously allowed Brown to use his debit card to buy gas. Brown relies upon several authorities that have extended the *Franks* rationale to require disclosure of material exculpatory information learned after the issuance of a warrant, but before its execution, to allow the issuing magistrate to determine whether probable cause for the warrant still exists. *See, e.g.*, *United States v. Perez*, 484 F.3d 735, 743 (5th Cir. 2007); *United States v. Bowling*, 900 F.2d 926, 931-32 (6th Cir. 1990); *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984).

Assuming, arguendo, that the *Franks* doctrine requires officers to return to the magistrate with newly discovered exculpatory information after a warrant was issued, we agree with the district court's assessment that Brown has not shown that such action here would have resulted in rescission of the warrant for lack of probable cause. First, Brown's assertion that officers had discovered the debit card on Breaw's body before Brown's arrest in Florida is not supported by the record. At the *Franks* hearing, Brown presented evidence that he was arrested on March 20, and that Breaw's body--with the missing bank card--was found the day before on March 19. However, the record also shows that at the request of the coroner, the officers did not go through Breaw's pockets before the autopsy. Although the bank card was in Breaw's pocket, it was not found until the autopsy was performed on March 21, the day after Brown's arrest. Thus, even if probable cause to arrest Brown for grand theft was extinguished when the debit card was found, that did not occur until after the warrant had been executed and Brown arrested.

Further, the district court correctly determined that the officers had not acted intentionally or recklessly by not returning to the magistrate with each piece of evidence gained throughout the investigation. The new information that was being uncovered by officers included not only evidence that Brown *may* not have stolen the credit card or used it without authority, but vastly more new inculpatory evidence suggesting the theft of other money from Breaw, and possibly implicating Brown in Breaw's death. Therefore, an update to the magistrate would not have been expected to result in the warrant being quashed but in its expansion to cover additional charges. The district court's finding that the officers did not intentionally or recklessly omit to update the magistrate with exculpatory evidence is well supported by the evidence. Accordingly, the district court's decision denying suppression of evidence on this ground is affirmed.

6

**B.      Involuntary Confession**

Brown next contends that the district court erred in denying his motion to suppress incriminating statements to police.  The motion asserted that his confession was involuntary because Brown was "of unsound mind" at the time of this interrogation by Florida police.  On appeal, Brown contends that the prosecution did not satisfy its burden of showing that his statements were voluntary.

To determine whether a confession is voluntary, a court must examine the totality of the circumstances and ask whether the defendant's will was overborne by police conduct.  *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991); *State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 (1993); *State v. Valero*, 153 Idaho 910, 912, 285 P.3d 1014, 1016 (Ct. App. 2012).  In determining the voluntariness of a confession, a court should consider the characteristics of the accused and the details of the interrogation, including whether *Miranda*[3] warnings were given, the youth of the accused, the accused's level of education or low intelligence, the length of the detention, the repeated and prolonged nature of the questioning, and deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Troy*, 124 Idaho at 214, 858 P.2d at 753; *Valero*, 153 Idaho at 912, 285 P.3d at 1016.  The presence or absence of *Miranda* warnings is a particularly significant factor.  *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ("[M]aintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."); *Berkemer v. McCarty*, 468 U.S. 420, 433, n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").  If, under the totality of the circumstances, the defendant's free will was overborne by threats, through direct or implied promises, or other forms of coercion, then the statement is not voluntary and is inadmissible. *Fulminante*, 499 U.S. at 285-87; *Troy*, 124 Idaho at 214, 858 P.2d at 753; *Valero*, 153 Idaho at 912, 285 P.3d at 1016.  While one's "mental condition is surely relevant to an individual's susceptibility to police coercion," it cannot alone make a statement involuntary because "coercive police activity is a necessary predicate to the finding that a

---

[3]      *See Miranda v. Arizona*, 384 U.S. 436 (1966).

confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 165, 167 (1986); *see also State v. Doe*, 131 Idaho 709, 713, 963 P.2d 392, 396 (Ct. App. 1998). When a defendant alleges an interrogation to be coercive, the State bears the burden of proving voluntariness of the defendant's confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *State v. Yager*, 139 Idaho 680, 685, 85 P.3d 656, 661 (2004); *State v. Johns*, 112 Idaho 873, 878, 736 P.2d 1327, 1332 (1987).

In his motion to suppress, Brown asserted that his statements to Florida police were involuntary "because he was of unsound mind when the statements were made, and he was not competent to make a statement." As support for this assertion, Brown relied upon his August 19, 2008, competency evaluation that had resulted in the district court ordering a ninety-day commitment to the Idaho Department of Correction's Secured Medical Facility for mental health treatment. Brown attached to a memorandum in support of his motion police reports reflecting that on two separate occasions, on March 22 and 23, 2007, he was interviewed by Florida police while in their custody, that each time he was given his *Miranda* rights and executed waivers, and that the interrogations were recorded. In the body of the memorandum, Brown made a number of factual assertions concerning his characteristics including an assertion that he "was of unsound mind" by reference to the August 2008 competency evaluation, that he was in his "late forties," and that he was "only of average intelligence." The memorandum acknowledged that Brown was given *Miranda* warnings, that his two detention interrogations lasted "several hours," and that he "does not allege a deprivation of sleep or water." Brown did not file an individual affidavit in support, so none of these factual assertions were submitted in evidentiary form. Neither were the police reports. The State did not file a response.

A hearing was conducted two days after the motion was filed. No testimony or other evidence was offered at the hearing. Defense counsel noted that the parties had stipulated to the district court's consideration of the psychological evaluation. It is entirely unclear whether the stipulation included the district court's consideration of the factual assertions made by Brown in his memorandum or the police reports attached thereto.

At the hearing, Brown did not allege that his statements were obtained because of police coercion. Instead, he argued only that his statements were not voluntary because of mental infirmity. The State's argument was also primarily focused on this issue. The district court

approached the matter as it was presented by the parties, concluding that any statements that Brown made to law enforcement agencies were not rendered involuntary based upon any claim of a mental health deficiency.

On appeal, Brown does not continue to advance his argument below that the "evidence" he presented shows he was mentally incapable of voluntarily confessing. Rather, Brown now argues that his suppression motion should have been granted because the State presented no evidence whatsoever to meet its burden of proving that his statements were voluntary.

Brown is correct in asserting that it was the State that bore both the burden of going forward with evidence and the burden of persuasion on Brown's suppression motion. In *State v. Davila*, 127 Idaho 888, 908 P.2d 581 (Ct. App. 1995), we described "[t]he procedure for establishing the voluntariness of a confession" as follows:

> Generally, the prosecution can meet its burden of proving a *prima facie* [case] of voluntariness by eliciting from the interrogating officer that the suspect had not been threatened or promised anything and appeared to freely decide for himself to forego the assistance of counsel and to provide an incriminating statement. If the defendant introduces evidence suggesting official overreaching and a significant impact of that overreaching upon the suspect, of course, the prosecution may well have to respond with more detailed and persuasive evidence in order to meet its burden of persuasion.

*Id.* at 891, 908 P.2d at 584 (quoting C. MCCORMICK ET AL., MCCORMICK ON EVIDENCE § 151 (4th ed. 1992). From the record before us, it appears that the prosecutor was under the misperception that Brown, rather than the State, bore the burden of proof on the suppression motion, for he argued that "our position is that there's nothing in the record, absolutely devoid in the record, to indicate that the statements that he made to [the Florida detective] and/or others in the state of Florida meet anybody's definition of involuntary." The State presented no evidence about the circumstances of the interrogations or Brown's mental acuity at the time. On the other hand, Brown did not even allege that he made his statements because of coercive police activity, which is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Connelly*, 479 U.S. at 167. Nor did he offer any evidence that the mental condition for which he was evaluated in Idaho in August of 2008 had any bearing upon the voluntariness of his statements made in Florida nearly a year and one-half earlier. However, determining that Brown presented little or no evidence of involuntariness does not mean that the State met its affirmative burden to prove voluntariness. In

short, the record is devoid of adequate evidence from which the trial court could make any finding concerning the voluntariness or involuntariness of Brown's statements to Florida police.

Although we are mindful that it was the State which failed in its burden of proof, we are unwilling to hold that Brown is thereby entitled to a windfall in the form of a suppression order in the absence of any allegation or evidence that the Florida police used coercive tactics. As we said in *State v. Bower*, 135 Idaho 554, 558, 21 P.3d 491, 495 (Ct. App. 2001): "Use of the exclusionary rule imposes a price upon society in that it often enables the guilty to escape prosecution. Therefore, the exclusionary rule should be employed only when there has *in fact been a violation of the defendant's constitutional rights*." An evidentiary vacuum does not enable a court to make the necessary findings. In this circumstance, we are constrained to vacate the order denying Brown's suppression motion and remand for a new hearing at which, presumably, the State will present some relevant evidence bearing upon the voluntariness or involuntariness of Brown's statements to Florida officers. If, on remand, the district court grants Brown's suppression motion, he must be allowed the opportunity to withdraw his guilty plea and have his judgment of conviction set aside. If however, on remand, the court denies the suppression motion, Brown's guilty plea and judgment of conviction need not be disturbed. Because the issue has come before this Court on a conditional plea preserving Brown's right to appeal the denial of his suppression motion, we expressly state that because we are remanding for further proceedings on the motion, Brown has not yet "prevailed" on this issue. That is, we are not granting suppression of Brown's confessions, which is the relief he sought in this appeal. Therefore, he has no immediate right to withdraw his plea pursuant to Idaho Criminal Rule 11(a)(2).

## C. Interception and Photocopying of Brown's Correspondence While Incarcerated

Brown next challenges the denial of his motion to suppress evidence obtained by police through their inspection of nonprivileged letters that he sent while incarcerated in the county jail. Evidence presented on this motion established that Brown's outgoing nonprivileged mail had been opened and photocopied. Brown asserts that this intrusion was investigative, not in furtherance of the security of the jail or other legitimate penological interest, and that this search of his mail violated the Fourth Amendment.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches are presumed to be unreasonable. *State v. Weaver*, 127 Idaho

288, 290, 900 P.2d 196, 198 (1995). *See also Arizona v. Gant*, 556 U.S. 332, 338 (2009). The Fourth Amendment is not implicated, however, unless the person invoking its protection had a "justifiable," "reasonable," or "legitimate expectation of privacy" that was invaded by the government action. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). A defendant attempting to suppress evidence bears the burden to show such a privacy interest and thus, "standing" to challenge a search. *State v. Holland*, 135 Idaho 159, 162, 15 P.3d 1167, 1170 (2000); *State v. Bottelson*, 102 Idaho 90, 92, 625 P.2d 1093, 1095 (1981). *See also Rakas v. Illinois*, 439 U.S. 128, 138-40 (1978) (prior "standing requirement" is subsumed in substantive Fourth Amendment analysis, which "focuses on the extent of a particular defendant's rights under the Fourth Amendment").

Nearly a century ago, the United States Supreme Court held that the Fourth Amendment does not prohibit the examination of prisoners' mail. *Stroud v. United States*, 251 U.S. 15, 21 (1919). In *Stroud*, letters written by a detainee were later used as evidence at trial. The Supreme Court held that there was no constitutional violation because the letters were obtained "under established practice, reasonably designed to promote the discipline of the institution." *Id*. While *Stroud* may be thought to resolve the claims presented here by Brown, some courts have questioned that decision's continued authority regarding a prisoner's privacy interest in view of the Supreme Court's more expansive interpretation of the privacy interests protected by the Fourth Amendment in *Katz v. United States*, 389 U.S. 347 (1967). *See United States v. Brown*, 878 F.2d 222, 225 (8th Cir. 1989); *United States v. Kelton*, 791 F.2d 101, 102-03 (8th Cir. 1986); *United States v. Savage*, 482 F.2d 1371, 1372-73 (9th Cir. 1973); 5 W. LaFave, Search and Seizure § 10.9(c) (5th ed. 2012). In *Katz*, the Supreme Court abandoned the notion that Fourth Amendment protections were tied exclusively to locations or property rights and instead held that its prohibition of unreasonable searches protects an individual's legitimate expectation of privacy, including a reasonable expectation of privacy in one's communications. *Katz*, 389 U.S. at 353.

Following *Katz*, courts have used differing approaches to address inmates' claims of unconstitutional mail inspections. A few courts have looked to the specific facts of the case to determine whether there was a "justifiable purpose" for examining a particular individual's mail. *Savage*, 482 F.2d at 1373 (in absence of a showing of a justifiable purpose of imprisonment or prison security, interception and photocopying of letter violated the Fourth Amendment);

11

*Witherow v. Crawford*, 468 F. Supp. 2d 1253, 1267 (D. Nev. 2006) (allowing interception of the inmates' mail while investigating whether the inmates were bringing illegal drugs into the prison); *Loza v. Mitchell*, 705 F. Supp. 2d 773, 882 (S.D. Ohio 2010) (holding actions were justified by legitimate penological interest because there was reason to believe outgoing letters were addressed to material witness); *Bowen v. State*, 30 S.W.3d 86, 90 (Ark. 2000) (concern for an inmate on suicide watch was "ample justification for opening their mail"). Other courts have turned to the institution's policy to determine whether there was a reasonable expectation of privacy in outgoing mail. *United States v. Whalen*, 940 F.2d 1027, 1034-35 (7th Cir. 1991) (no expectation of privacy in letters that the institutional policy required the inmates to leave unsealed); *State v. Cuypers*, 481 N.W.2d 553, 557 (Minn. 1992) (no constitutional violation when letters inspected according to valid jail regulation that furthers institutional security). Some of these cases highlight the fact that the inmate was on notice that letters would be searched which, the courts said, precludes an expectation of privacy. *Busby v. Dretke*, 359 F.3d 708, 711-12 (5th Cir. 2004) (no expectation of privacy when "on notice" his mail would be inspected); *Smith v. Shimp*, 562 F.2d 423, 426-27 (7th Cir. 1977) (a pretrial detainee yields any expectation of privacy, when "he knowingly exposes [his mail] to possible inspection, by jail officials"); *United States v. Wilson*, 447 F.2d 1, 8 (9th Cir. 1971) (guarded language used in a letter indicated that the inmate was aware the letters would be inspected); *State v. Martin*, 825 A.2d 835, 849 (Conn. App. Ct. 2003) (no reasonable expectation of privacy after being informed mail would be monitored); *State v. Wiley*, 565 S.E.2d 22, 32-33 (N.C. 2002) (no subjective expectation of privacy when detainees are aware that their mail will be inspected); *Commonwealth v. Moore*, 928 A.2d 1092, 1099 (Pa. Super. Ct. 2007) (no expectation of privacy when inmate "availed himself of the process that exposed his correspondence to the plain view of prison officials"); *State v. Telford*, 940 P.2d 522, 525 (Utah Ct. App. 1997) (notice of policy requiring letters to be "inspected and scanned" eliminated legitimate expectation of privacy).

A final group of courts have simply held that the institution's interest in maintaining security outweighs the inmate's privacy interest. *Kelton*, 791 F.2d at 103 (interest in deterring criminal activity allowed officials to open and copy outgoing mail); *United States v. Ligambi*, 886 F. Supp. 2d 492, 496-97 (E.D. Pa. 2012) (found no objectively reasonable expectation of privacy in an inmate's correspondence); *State v. Ruan*, 419 N.W.2d 734, 737 (Iowa Ct. App. 1987) (no legitimate expectation of privacy because "the balance must be struck in favor of

institutional security"); *Sparkman v. State*, 968 A.2d 162, 174 (Md. 2009) (reading mail was acceptable because any expectation of privacy was outweighed by the institution's security needs).

Brown relies upon Ninth Circuit Court of Appeals decisions requiring a specific justifiable purpose validating a search. In *Savage*, the Ninth Circuit held that "absent a showing of some justifiable purpose of imprisonment or prison security the interception and photocopying of the letter was violative of the [F]ourth [A]mendment." *Savage*, 482 F.2d at 1373. That court later stated that inmates possess a "reasonable expectation of privacy in a sealed letter." *United States v. Vallez*, 653 F.2d 403, 406 (9th Cir. 1981).

However, the *Vallez* and *Savage* rationale may not survive the subsequent Supreme Court decision in *Hudson v. Palmer*, 468 U.S. 517 (1984), which addressed prisoners' Fourth Amendment rights in the context of random individualized cell searches. The *Hudson* Court rejected the view that searches may be constitutionally conducted only according to an established policy or individualized suspicion. *Id.* at 528-29. Instead, the Court said that determining whether an inmate's expectation of privacy is legitimate or reasonable entails a balancing of the "interest of society in the security of its penal institutions [against] the interest of the prisoner in privacy within his cell." *Id.* at 527. The Court struck the balance in favor of security, saying that "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." *Id.* at 528. The Court concluded, "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continuous surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527-28. The *Hudson* analysis has led some lower courts to question the continued viability of the Ninth Circuit's analysis in *Savage*. *See, e.g.*, *State v. Dunn*, 478 So. 2d 659, 663 (La. Ct. App. 1985).

If the Ninth Circuit's holding in *Savage* governs, then Brown is correct in his assertion that the district court erred in holding that the State here made the required showing of some justifiable penological interest. Although the prosecutor argued that specific aspects of Brown's conduct justified inspection of his mail, including Brown's history of creating false identities for himself and his wife, his having sent materials out of the jail in violation of jail rules, and his communications with other persons charged with violent crimes, the prosecutor presented no evidence to support those assertions. Additionally, there is no evidence in the record of any jail

13

policy that could support the district court's finding that the jail had an institutional policy in place.

Unfortunately for Brown, however, we conclude that such proof is not required for affirmation of the district court. *See State v. Pierce*, 107 Idaho 96, 102, 685 P.2d 837, 843 (Ct. App. 1984) (a correct ruling based on an incorrect reason may be sustained upon the proper legal theory). We agree with the district court's denial of Brown's motion to suppress evidence gained from the search of his correspondence because we conclude that Brown possessed no reasonable expectation of privacy in his nonprivileged mail while he was incarcerated. In our view, the United States Supreme Court's analysis in *Hudson*, balancing the inmate's claimed privacy interest against the correctional institution's security needs, is applicable here. This approach does not resort to case-by-case resolution dependent upon particular circumstances or individualized suspicions and recognizes that "loss of freedom of choice and privacy are inherent incidents of confinement." *Hudson*, 468 U.S. at 528 (quoting *Bell v. Wolfish*, 441 U.S. 520, 537 (1979)). A prison's security needs that must be weighed against a prisoner's privacy interest are readily apparent and were described by the United States Supreme Court as follows:

> Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others. . . .
> Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize.

*Id.* at 526-27.

Outgoing mail may present less of a security risk than the prospect of contraband secreted in a prison cell, which was addressed in *Hudson*, but inmate mail nevertheless raises legitimate security issues. Inmates may use outgoing mail to communicate to persons on the outside the inmates' requests, plans, and methods to smuggle contraband into the institution; to devise and

14

direct escape strategies; to direct confederates to intimidate witnesses inside or outside of the institution; or to indirectly communicate threats, harassment, or escape plans to other inmates by using persons outside as a go between.[4] Monitoring of inmate mail can curtail these security risks.

In view of the security risks to be addressed, the prophylactic effect mail inspection provides, and the settled recognition that diminution of privacy is an inherent "incident of confinement," *Id.* at 528, we hold that the balance must be struck in favor of institutional security. Any privacy interest claimed by Brown in these circumstances is not one that society would recognize as reasonable or legitimate. *See id.* Therefore, the district court did not err in denying Brown's motion to suppress evidence gained through inspection of his outgoing letters.

**D.**     **Failure to Present Brown before a Magistrate**

One of the grounds advanced by Brown for his motion to suppress statements he made to law enforcement officials was a contention that he had not been taken before a federal magistrate within six hours of his arrest, allegedly in violation of federal law. The district court denied the motion, and on appeal Brown posits error in this ruling while also acknowledging that the Federal Rules of Criminal Procedure and 18 U.S.C.A. § 3501(c) are inapplicable to a state prosecution. Brown has neither cited authority nor made any reasoned argument in support of this claim of error. Therefore, it will not be considered on appeal. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) ("When issues on appeal are not supported by propositions of law, authority, or argument, they will not be considered.").

**E.**     **Lack of Probable Cause**

During the preliminary hearing at which he was bound over on charges of first degree murder and grand theft, Brown filed a motion to dismiss those charges on the ground that the preliminary hearing evidence did not show probable cause for the charges. In support of that motion, Brown argued that "this type of killing at most was a voluntary manslaughter" and that he was at most an "accessory after the fact" on the grand theft. Brown's motion to dismiss both charges was denied, and he challenges that decision on appeal.

---

[4]     Creative inmates have even attempted to circumvent a policy prohibiting inmate-to-inmate correspondence by mailing a letter to a nonexistent address and putting a different inmate's name on the return address so that when the mail is returned to the prison as undeliverable, it will go to the other inmate. *See Sparkman v. State*, 968 A.2d 162, 164 (Md. 2009).

As noted above, the charges against Brown were later reduced to manslaughter and accessory to grand theft, which are the charges to which he pleaded guilty. Therefore, his challenge to the sufficiency of the preliminary hearing evidence to establish probable cause for the higher charges is moot. *See State v. Manzanares*, 152 Idaho 410, 419, 272 P.3d 382, 491 (2012). Accordingly, we will not address this issue further.

**F.      Rule 35 Motion**

The final issue is Brown's challenge to the district court's refusal to allow new testimony in support of Brown's motion for reduction of his sentences. If, on remand, the district court grants Brown's motion to suppress evidence of his statements to police, the judgment of conviction and sentence will be vacated and this issue regarding Brown's Rule 35 motion will be moot. Nevertheless, because the judgment of conviction and sentence may not be vacated on remand, and in the interest of judicial economy, we will address Brown's argument.

Brown was sentenced to a unified term of imprisonment of fifteen years with ten years determinate for voluntary manslaughter and a concurrent determinate term of five years for accessory to grand theft. He filed a motion pursuant to Idaho Criminal Rule 35 requesting reduction of the sentences and sought the court's permission to submit supporting testimony, including his own testimony and that of a forensic pathologist, a firearms expert, and a polygrapher. The district court denied the request to submit this additional evidence. On appeal, Brown argues that the district court abused its discretion by refusing to allow this additional testimony and thereby unduly limited the information that the court would consider in deciding the Rule 35 motion. He asks that we vacate the order denying the Rule 35 motion and remand for a new evidentiary hearing at which he would be allowed to present his witnesses' testimony.

Idaho Criminal Rule 35 states that any motion "shall be considered and determined by the court without the admission of additional testimony and without oral argument, unless otherwise ordered by the court in its discretion." Under the rule, the decision of whether to have an evidentiary hearing on a motion to reduce a legally-imposed sentence is committed to the sound discretion of the trial court. *State v. Peterson*, 126 Idaho 522, 525, 887 P.2d 67, 70 (Ct. App. 1994); *State v. Puga*, 114 Idaho 117, 118, 753 P.2d 1263, 1264 (Ct. App. 1987). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and

consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

The district court explained its decision to disallow additional testimony as follows:

> The request for additional evidence is discretionary with the Court. When I think back on the case and we had a number of hearings in Sandpoint, pretrial hearings, Mr. Brown was quite prolific in his written documents submitted to the Court and to everyone else. We had a mediation, a plea, Alford plea, after the mediation. We had the presentence report prepared and had the sentencing hearing with the full opportunity to call any witnesses who might have something relevant to say at the sentencing hearing.
>
> It doesn't seem to me that--that there is much to be gained here by calling a pathologist, a firearms expert, and a polygrapher. And as far as those--any testimony from those people would go to the--seems to me would go to issues of guilt, innocence or guilt, and that was taken care of when we took the plea.
>
> As far as Mr. Brown is concerned, he had the opportunity, as I stated, and he submitted reams and reams of written material. So I think that anything he's had to present to the Court has been presented. So I'm going to exercise my discretion and deny the request for additional testimony.

Brown concedes that whether to conduct a Rule 35 hearing is discretionary, but he contends that "once [the court] held a hearing, it could not unduly narrow its own discretion at that hearing." Brown cites *State v. Torres*, 107 Idaho 895, 693 P.2d 1097 (Ct. App. 1984) in support of his proposition, but that case is easily distinguishable. In *Torres*, the district court mistakenly believed that it lacked discretion to even consider the offered evidence. The court there did not merely make a discretionary decision to disallow additional evidence but misperceived that in ruling on the Rule 35 motion, the court was limited to only the information that had been available to a prior judge when the sentence was imposed. *Id.* at 898, 693 P.2d at 1100. Here, by contrast, the district court understood the scope of its discretion and declined to hear proffered experts because it was apparent that their testimony would address matters relevant principally to the question of guilt rather than sentencing. We find no abuse of discretion in that regard. Nor do we find any abuse of discretion in the court's refusal to hear additional testimony from Brown who, as the court noted, had an opportunity to present anything he desired at the sentencing hearing. We also observe that if Brown had any cogent evidence that would have supported his request for reduction of his sentence, he could have presented it through affidavits accompanying the motion instead of attempting to present live testimony.

The record shows that the district court understood the scope of its discretion, that it acted within the bounds of its discretion, and that it did so for a logical reason. Therefore, no abuse of discretion is shown.

## III.

## CONCLUSION

The district court's order denying Brown's suppression motion made on the ground that his confession was involuntary is vacated and the case is remanded for a new hearing on this motion. In the event that the motion is granted on remand, Brown must be given the opportunity to withdraw his guilty plea and have the judgment of conviction vacated. The district court's orders are in all other respects affirmed. This case is remanded for further proceedings in compliance with this opinion.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**